UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KATHLEEN DONOVAN,          )
and PATRICIA CAWLEY,       )          **Civil Action No.:  06-12234 DJC**
                           )
      Plaintiffs,          )
                           )
                   v.      )
                           )
                           )
PHILIP MORRIS USA, INC.,   )
                           )
      Defendant.           )
                           )

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT PHILIP MORRIS USA INC.'S
MOTION FOR DECERTIFICATION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES …………….....…………………………….....        ii

INTRODUCTION …………………………………………..……………...        1

ARGUMENT ……………………………………………………………..…        3

I.      THIS ACTION WAS PROPERLY CERTIFIED PURSUANT TO FED. R.
        CIV. P. 23(b)(2) ……………………………………………………        4

II.     PHILIP MORRIS' UNAVAILING ARGUMENTS CONCERNING
        ALLEGED "INDIVIDUAL ISSUES" WERE PROPERLY REJECTED BY
        JUDGE GERTNER …………………………………………………        13

III.    PHILIP MORRIS' RENEWED ASCERTAINABILITY OBJECTION
        LACKS MERIT …………………………………………………….....        21

IV.     PHILIP MORRIS' MOTION FAILS TO ADDRESS PLAINTIFFS'
        CHAPTER 93A CLASS ……………………………………………        28

CONCLUSION …………………………………………………………        30

## TABLE OF AUTHORITIES

**Cases**

*Aerovox, Inc. v. Parallax Power Components, LLC (In re Aerovox, Inc.)*,,
   281 B.R. 419 (Bankr. D. Mass. 2002) .......................................................................29

*American Life Insurance Co. v. Stewart*,
   300 U.S. 203 (1937) ...................................................................................................8

*Aspinall v. Philip Morris Cos.*,
   813 N.E.2d 476 (Mass. 2004) ....................................................................19, 28, 29

*Barth v. Firestone Tire & Rubber Co.*,
   673 F. Supp. 1466 (N.D. Cal. 1987) ..........................................................................6

*Battle v. Pennsylvania*,
   629 F.2d 269 n.1 (3d Cir. 1980)................................................................................21

*Bouaphakeo v. Tyson Foods, Inc.*,
   2011 U.S. Dist. LEXIS 95814 (N.D. Iowa Aug. 25, 2011) ........................................5

*Ciardi v. F. Hoffmann La Roche, Ltd.*,
   762 N.E.2d 303 (Mass. 2002) ..................................................................................28

*Colter v. Barber-Greene Co.*,
   403 Mass. 50, 525 N.E.2d 1305 (Mass. 1988) ........................................................18

*CoxCom, Inc. v. Chaffee*,
   536 F.3d 101 (1st Cir. 2008)......................................................................................6

*Crosby v. Soc. Sec. Admin.*,
   796 F.2d 576 (1st Cir. 1986)....................................................................................22

*Derdiarian v. Felix Contractor Corp.*,
   414 N.E.2d 666 (N.Y. 1980)....................................................................................20

*Donovan v. Philip Morris USA, Inc.*,
   914 N.E.2d 891 (Mass. 2009) ...........................................................................15, 17

*Donovan*,
   268 F.R.D. ..........................................................................................................passim

*Ebay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) ........................................6

*Feeney v. Dell,*
    908 N.E.2d 753 (Mass. 2009) ......................................................................... 28, 29

*Finch v. N.Y. State Office of Children & Family Servs.,*
    252 F.R.D. 192 (S.D.N.Y. 2008) ............................................................................21

*Fletcher v. Cape Cod Gas Co.,*
    477 N.E.2d 116 (1985) ............................................................................................28

*Fogarazzo v. Lehman Bros., Inc.,*
    232 F.R.D. 176 (S.D.N.Y. 2005) ............................................................................22

*Frank J. Linhares Co. v. Reliance Ins. Co.,*
    4 Mass. App. Ct. 617 (Mass. App. Ct. 1976) .......................................................29

*Gates v. Rohm & Haas Co.,*
    655 F.3d 255 (3d Cir. 2011) ............................................................................. 15, 16

*Gillespie v. Sears Roebuck & Co.,*
    386 F.3d 21 (1st Cir. 2004) ....................................................................................18

*Gomez v. Illinois State Bd. of Education,*
    117 F.R.D. 394 (N.D. Ill. 1987) ............................................................................22

*Gonzales v. Arrow Fin. Serv. LLC,*
    489 F. Supp. 2d 1140 (S.D. Cal. 2007) ...................................................................3

*Gordon v. Hunt,*
    117 F.R.D. 58 (S.D.N.Y. 1987) ...............................................................................3

*Gormley v. Clark,*
    134 U.S. 338 (1890) .................................................................................................8

*Gratz v. Bollinger,*
    539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003) ....................................24

*Groover v. Michelin North Am., Inc.,*
    187 F.R.D. 662 (M.D. Ala. 1999) ...........................................................................3

*Haglund v. Philip Morris, Inc.,*
    847 N.E.2d 315 (Mass. 2006) ................................................................................19

*Hammer v. JP's Southwestern Foods, L.L.C.*,
    2011 U.S. Dist. LEXIS 4734 (W.D. Mo. Jan. 19, 2011) ....................................................3

*Haynes v. Dart*,
    2009 U.S. Dist. LEXIS 65742 (N.D. Ill. July 29, 2009) .................................................21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001) .................................................................................. 22, 27

*In re Lupron Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005) ....................................................................................22

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    267 F.R.D. 113 (D.N.J. 2010) ........................................................................................3

*In re Motor Fuel Temperature Sales Practices Litig.*,
    271 F.R.D. 263 (D. Kan. 2010) ....................................................................................22

*In re Pina*,
    363 B.R. 314 (Bankr. D. Mass. 2007) ..........................................................................29

*In re Tetracycline Cases*,
    107 F.R.D. 719 (W.D. Mo. 1985) .................................................................................22

*Interstate Cigar Co. v. United States*,
    928 F.2d 221 (7th Cir. 1991) ..........................................................................................8

*Jones v. Fenton Ford, Inc.*,
    427 F. Supp. 1328 (D. Conn. 1977) ................................................................................8

*Joseph v. General Motors Corp.*,
    109 F.R.D. 635 (D. Colo. 1986) ...................................................................................22

*Karcher v. Burbank*,
    21 N.E.2d 542 (Mass. 1939) ....................................................................................... 8, 9

*Lally v. Volkswagen Aktiengesellschaft*,
    45 Mass. App. Ct. 317, 698 N.E.2d 28 (Mass. App. Ct. 1998) ................................ 18, 19

*Langley v. Coughlin*,
    715 F. Supp. 522 (S.D.N.Y. 1989) .................................................................................3

*Leardi v. Brown*,
    474 N.E.2d 1094 (Mass. 1985) .....................................................................................29

iv

*Lindquist v. Farmers Ins. Co.,*
  2008 U.S. Dist. LEXIS 11832 (D. Ariz. Feb. 6, 2008) ........................................................22

*Linthicum v. Archambault,*
  398 N.E.2d 482 (Mass. 1979) .........................................................................................29

*Marchant v. Dayton Tire & Rubber Co.,*
  836 F.2d 695 (1st Cir. 1988) ...........................................................................................19

*McGrath v. C. T. Sherer Co.,*
  195 N.E. 913 (Mass. 1935) ...............................................................................................8

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles,*
  246 F.R.D. 621 (C.D. Cal. 2007) ....................................................................................22

*Nallan v. Helmsley-Spear, Inc.,*
  407 N.E.2d 451 (1980) ...................................................................................................20

*Newsome v. Up-To-Date Laundry, Inc.,*
  219 F.R.D. 356 (D. Md. 2004) ........................................................................................24

*Purity Supreme, Inc. v. Attorney Gen.,*
  407 N.E.2d 297 (Mass. 1980) .........................................................................................28

*Ramirez v. Greenpoint Mortg. Funding, Inc.,*
  268 F.R.D. 627 (N.D. Cal. 2010) ....................................................................................24

*Rice v. City of Phila.,*
  66 F.R.D. 17 (E.D. Pa. 1974) ..........................................................................................22

*Rolland v. Patrick,*
  2008 U.S. Dist. LEXIS 66477 (D. Mass. Aug. 19, 2008) ....................................................4

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  217 F.3d 8 (1st Cir. 2000) ........................................................................................6, 9, 17

*Rule v. Fort Dodge Animal Health, Inc.,*
  607 F.3d 250 (1st Cir. 2010) ...........................................................................................28

*Shook v. El Paso County,*
  386 F.3d 963 (10th Cir. 2004) .........................................................................................21

*Simmons v. Monarch Mach. Tool Co., Inc.,*
  413 Mass. 205, 596 N.E.2d 318 (Mass. 1992) .................................................................18

*Slaney v. Westwood Auto, Inc.*,
  322 N.E.2d 768 (Mass. 1975) ....................................................................................29

*Slaven v. BP Am., Inc.*,
  190 F.R.D. 649 (C.D. Cal. 2000) ..................................................................................3

*Smith v. Ariens Co.*,
  375 Mass. 620, 377 N.E.2d 954 (Mass. 1978) ..........................................................18

*States Res. Corp. v. Architectural Team, Inc.*,
  433 F.3d 73 (1st Cir. 2005)...........................................................................................28

*Stewart v. Cheek & Zeehandelar, LLP*,
  252 F.R.D. 387 (S.D. Ohio 2008) ................................................................................21

*Uloth v. City Tank Corp.*,
  376 Mass. 874, 384 N.E.2d 1188 (Mass. 1978) ........................................................18

*United States v. Bluitt*,
  815 F. Supp. 1314 (N.D. Cal. 1992) ..............................................................................8

*United States v. Ricketts*,
  2002 U.S. Dist. LEXIS 13198 (W.D. Mich. July 16, 2002) .......................................8

*Unites States v. Philip Morris*,
  449 F. Supp. 2d 1 (D.D.C. 2006) .........................................................................passim

*Vassallo v. Baxter Healthcare Corp.*,
  428 Mass. 1, 696 N.E.2d 909 (Mass. 1998)...............................................................18

*Vivendi Universal, S.A. Sec. Litig.*,
  2009 U.S. Dist. LEXIS 31198 (S.D.N.Y. Mar. 31, 2009) ...........................................3

*Voss v. Black & Decker Mfg. Co.*,
  450 N.E.2d 204 (N.Y. 1983) .......................................................................................20

*Wal-Mart Stores Inc. v. Dukes*,
  131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ..........................................................passim

*Woe v. Cuomo*,
  729 F.2d 96 (2d Cir. 1984) .............................................................................................3

*Yaffe v. Powers*,
  454 F.2d 1362 (1st Cir. 1972) .....................................................................................21

vi

**Statutes**

Mass. Gen. Laws ch. 93A ...................................................................................................... 29

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................................ 15
Fed. R. Civ. V. P. 23(b)(2)................................................................................................ passim
Fed. R. Civ. P. 23(c)(2)........................................................................................................ 22
Fed. R. Civ. P. 23(f) ...................................................................................................... 2, 4, 5
Rule 23 ............................................................................................................................ passim
Rule 23(a)(2) ........................................................................................................................ 15

**Other Authorities**

*The Class Certification of Medical Monitoring Claims*,
    102 Colum. L. Rev. 1659 (2002) ................................................................................. 25

## INTRODUCTION

Defendant Philip Morris USA, Inc. ("Philip Morris") has used this case's reassignment as an occasion for filing a decertification motion. Its pretexts for doing so are the mistaken notions that *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), or developments in the medical world respecting the use of low dose CT scans ("LDCTs") for lung cancer surveillance, render class certification inadvisable. In fact, all that Philip Morris has done is to revive the same arguments it has advanced throughout this litigation. Philip Morris was incorrect when it resisted class certification. It was incorrect when it advanced the same arguments to the First Circuit in support of its unsuccessful petition for interlocutory review pursuant to Fed. R. Civ. P. 23(f). It is still incorrect. Nothing has changed, except that the strength of Plaintiffs' medical contentions is now well nigh unassailable.

The docket of this case abounds in legal argument and factual submissions respecting class certification. (*See, e.g.*, D. 60-66; D. 82-83; D. 111; D. 117; D. 243-260). Accordingly, Plaintiffs already have submitted a substantial and compelling body of factual proofs, expert and otherwise, demonstrating the merit of certification.

The issues presently advanced by Philip Morris are whether: a) the remedy at issue is injunctive; b) common questions and common answers to those questions exist in this litigation; and c) the class is "ascertainable." For each of these topics, not only did Judge Gertner write at length, but the parties also provided her with ample proof justifying her conclusions. In the body of the Memorandum to follow, the most salient of these will be summarized and appended. However, this

is no substitute for the full record developed in this action, which is incorporated herein by reference.[1]

Finally, prior to the upcoming status conference, Plaintiffs will file certain Reply Memoranda respecting certain dispositive Motions, which were filed shortly before Judge Gertner's retirement. Those Motions engage the issues implicated in this decertification application, and their resolution would shape future proceedings. For instance, D. 247 seeks to strike the Affirmative Defense alleging that there exists an "adequate remedy at law" – and thus is essentially the converse of the first Point in Philip Morris' Decertification Motion. Plaintiffs also will submit their Reply concerning "participation rates" in the medical monitoring program (D. 245), which will affect the scope of remaining expert discovery, and touches upon the injunctive nature of the remedy. Plaintiffs will likewise file the Reply Memoranda concerning their Motion for Partial Summary Judgment (D. 259) and the related Motion to Strike Philip Morris' Affirmative Defense concerning "alternative safer design" (D. 251), which bear on the proximate causation issue raised in Philip Morris' decertification papers.[2]

If the Court grants those Motions, finding as a matter of law that Philip Morris breached the implied warranty of merchantability causing the Plaintiffs to experience an increased risk of lung cancer, then what remains is an inquest on the nature of an injunctive remedy. As discussed in Plaintiffs' Statement in Support of their Proposed Approach to Sequence and Scheduling (D. 310),

---

[1] Notably, argument by Plaintiffs and evidence and legal support respecting the injunctive nature of the relief sought may be found at D. 62 at pp. 13-15, 23-31 (Memo of Law in Support of Motion to Certify Class), and the exhibits referenced therein; D. 82 at pp. 6-9 (Reply in Support of Motion to Certify Class); D. 111 at pp. 9-11 (Supplemental Memo of Law in Support of Motion to Certify Class); D. 116 at p. 6 (Reply to Philip Morris' Opposition to Plaintiffs' Supplemental Memo of Law in Support of Class Certification); D. 248 (Memo of Law in Support of Motion to Strike Thirty-Sixth Affirmative Defense (Respecting Adequate Remedy at Law)), the exhibits in support of those submissions, and the reply memoranda being submitted shortly. Argument and evidence respecting common questions and common answers may be found at D. 62 at pp. 19-20; D. 82 at pp. 12-23; D. 111 at pp. 11-15; D. 116 at pp. 4-6. Argument and evidence respecting ascertainability may be found at D. 82 at pp. 9-12, and the exhibits in support thereof; D. 116 at pp. 2-3, and the exhibits in support thereof.

[2] Philip Morris appears to agree with Plaintiffs that the Partial Summary Judgment Motion (D. 259-60); the related Motion respecting alternative safer design (D. 251-52); and the Motion respecting the adequacy of legal remedy (D. 247-48) are logically intertwined with the instant Motion. (*See* D. 314 at p. 1).

that would constitute a different trial from one concerned with all aspects of misconduct and proximate causation, and would significantly streamline the remaining pretrial proceedings.

**ARGUMENT**

Decertifying "a class should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a drastic step." *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 U.S. Dist. LEXIS 31198, *22 (S.D.N.Y. Mar. 31, 2009) (*quoting Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)). *See also J.S. v. Attica Cent. Sch.,* 2011 U.S. Dist. LEXIS 109676, *18-19 (W.D.N.Y. Sept. 25, 2011); *Hammer v. JP's Southwestern Foods, L.L.C.*, 2011 U.S. Dist. LEXIS 4734, *4 (W.D. Mo. Jan. 19, 2011); *Gonzales v. Arrow Fin. Serv. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007). Thus, the party seeking to revisit a certification ruling must affirmatively demonstrate that the elements of Rule 23 have not been established. *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1153 (S.D. Cal. 2007); *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 651 (C.D. Cal. 2000). Any "'doubts regarding the propriety of class certification should be resolved in favor of certification.'" *Slaven*, 190 F.R.D. at 651 (*quoting Groover v. Michelin North Am., Inc.*, 187 F.R.D. 662, 670 (M.D. Ala. 1999); 4 NEWBERG ON CLASS ACTIONS § 7540 (3d ed. 1992)); *Gonzales*, 489 F. Supp.2d at 1154 (same); *Hammer v. JP's Southwestern Foods, L.L.C.*, 2011 U.S. Dist. LEXIS 4734, at *4 (same).

Courts faced with a motion to decertify also must take account of the progression of the litigation. *Langley v. Coughlin*, 715 F. Supp. 522, 552 (S.D.N.Y. 1989); *see also Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir.) (finding that decertification constituted abuse of discretion), *cert. denied*, 469 U.S. 936, 83 L. Ed. 2d 274, 105 S. Ct. 339 (1984). Requests to reconsider class certification rulings are viewed with particular disfavor where, as here, they follow a denial of a petition for interlocutory review pursuant to Fed. R. Civ. P. 23(f), which is the proper mechanism for seeking review of an adverse certification decision. *See In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 135 (D.N.J. 2010) ("After a thorough review of the case law in this and other circuits, the Court has been

unable to find a single case in which a district court entertained a motion for reconsideration of an order certifying a class after a request for interlocutory review of that order pursuant to Rule 23(f) was denied."); *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 U.S. Dist. LEXIS 31198, at *21, 57 (denying motion for partial reconsideration of class certification ruling following denial of petition for interlocutory appeal); *Rolland v. Patrick*, 2008 U.S. Dist. LEXIS 66477, *4, 25 (D. Mass. Aug. 19, 2008) (denying decertification motion made years after denial of Fed. R. Civ. P. 23(f) petition). *See also Connor B. v. Patrick*, 2011 U.S. Dist. LEXIS 130444, *16 (D. Mass. Nov. 10, 2011) (Ponsor, J.) ("Allowing litigants to file a motion to decertify at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless").

## I. THIS ACTION WAS PROPERLY CERTIFIED PURSUANT TO FED. R. CIV. P. 23(b)(2)

Fed. R. Civ. P. 23(b)(2) is satisfied if the defendant "has acted or refused to act on grounds that apply generally to the class," so that final injunctive relief "is appropriate respecting the class as a whole." Those familiar requirements were addressed at length in the Court's certification opinion, which carefully evaluated both the legal authorities and extensive record evidence. Despite the Court's clear holding otherwise, Philip Morris again argues that injunctive relief is improper respecting the class as a whole. As before, it attempts to persuade the Court that (1) Plaintiffs seek a compensable item of damages, (2) Plaintiffs have an adequate remedy at law, and (3) relief is not appropriate for the entire class.

These arguments were already rejected by the Court. *Donovan*, 268 F.R.D. at 11-28. No legal or factual developments since this class was certified undermine that holding.

With regard to "legal developments," Philip Morris asserts that *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011), renders certification pursuant to Fed. R. Civ. P. 23(b)(2) improper. It does not. *Dukes* involved an attempt to certify the gender discrimination claims

approximately 1.5 million current and former Wal-Mart employees from stores nationwide, under Title VII of the Civil Rights Act of 1964. The plaintiffs sought to recover punitive damages, backpay (a money damage remedy), and injunctive and declaratory relief based upon claims of gender discrimination, although they did not claim that a common corporate policy against the advancement of women existed, and Wal-Mart's official policy forbade sex discrimination. Instead, pay and promotion decisions at Wal-Mart were committed to "local managers' broad discretion, which [was] exercised in a largely subjective manner." *Id.* at 2547-2548, 2553 (citation omitted).

The Supreme Court held that certification was improper because proof that Wal-Mart operated under a general policy of discrimination was entirely absent. *Id.* at 2553-54. In so ruling, the Court observed that the putative class members "held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed. . . ." *Id.* at 2557 (citation omitted).

In the second part of its decision, the *Dukes* Court held that the plaintiffs' claims for backpay were improperly certified under Rule 23(b)(2). *Id.* at 2559. According to the Court, claims for monetary relief which are not incidental to injunctive or declaratory relief -- including the *Dukes* plaintiffs' claims for backpay -- should not be certified under Rule 23(b)(2). *Id.*

Self-evidently, *Dukes* addressed neither products liability law nor medical monitoring remedies. Contrary to Philip Morris' contention, *Dukes* also "did not change the law for all class action certifications." *See Connor B. v. Patrick*, 2011 U.S. Dist. LEXIS 130444, at *9. Instead, it "provided guidance on how existing law should be applied to expansive, nationwide class actions," wholly unlike the case currently before the court. *Id.*[3]

---

[3] Notably, *Connor B. v. Patrick, supra*, 2011 U.S. Dist. LEXIS at 130444, is one of a number of unsuccessful decertification motions which have been filed (and rejected) since *Dukes* was decided. *See also, e.g., Jermyn v. Best Buy Stores, L.P.*, 2011 U.S. Dist. LEXIS 104449, *3 (S.D.N.Y. Sept. 15, 2011) (denying decertification motion); *Bouaphakeo v. Tyson*

Nonetheless, Philip Morris maintains that *Dukes* warrants decertification of the Rule 23(b)(2) class because it "confirm[s] that relief is not 'injunctive' simply because it is 'equitable'" (Defendant's Memorandum in Support of its Motion for Decertification [hereafter "Decert."] at 1). However, the certification of the instant class was by no means premised on an observation that medical monitoring is "equitable." Instead, the Court carefully evaluated the contours of the programmatic remedy sought by Plaintiffs. It recognized that "plaintiffs seek a structured program, monitored by and staffed with medical personnel, in which class members will receive regular medical screenings." *Donovan*, 268 F.R.D. at 22. The Court then engaged in a lengthy and reasoned analysis addressing the standard for granting injunctive relief, and found that "Plaintiffs lack an adequate remedy at law." *Id.* at 26 (*citing Ebay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006); *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000); *Barth v. Firestone Tire & Rubber Co.*, 673 F. Supp. 1466, 1478 (N.D. Cal. 1987)). It further determined that the class members have suffered an irreparable injury; that a remedy in equity is warranted in light of the "balance of hardships" between the parties; and that the public interest would not be disserved by a permanent injunction. *Id.*

The Court then addressed the host of federal authorities which hold that medical monitoring constitutes an injunctive remedy where the plaintiffs seek a court-supervised program, monitored by and staffed with medical personnel, to ensure that class members receive regular medical screenings. *Id.* at 22-23. It further recognized that the instant class included no individualized claims for money damages, and that the sole form of relief sought was establishment of a medical monitoring program, which would be "uniform for all members," without any need for "individual tailoring." *Id.* at 27. Following that careful analysis, the Court certified the proposed class pursuant to Fed. R. Civ. P. 23(b)(2).

---

*Foods, Inc.*, 2011 U.S. Dist. LEXIS 95814, *5-12 (N.D. Iowa Aug. 25, 2011) (same); *Martinez-Hernandez v. Butterball, LLC*, 2011 U.S. Dist. LEXIS 112045, *12-13 (E.D.N.C. Sept. 29, 2011) (same).

Nothing about *Dukes* remotely alters the legal underpinnings of that analysis, or the correctness of the Court's findings. Briefly, unlike *Dukes*, the instant class solely seeks medical monitoring, and makes no demand for compensatory or punitive damages. Further, Plaintiffs have demonstrated the need for injunctive relief in the form of a medical monitoring program in order to create the infrastructure to administer, support, and service a class-wide program sufficient to provide the class members with periodic LDCT surveillance.

Contrary to Philip Morris' claim, no recent "factual developments" cast doubt on the Court's ruling. To be sure, advances in medical science have compellingly demonstrated the merits of Plaintiffs' original contentions respecting lung cancer screening. They include the NLST, a federally funded study involving approximately 53,000 participants, hailed as the "gold standard" by Philip Morris' experts when this action was commenced. (*See* Ex. M [Goodman Dep.] at p. 95:9-15) One year ago, the NLST announced that participants receiving LDCT scans had a 20 percent lower risk of dying from lung cancer than the control group receiving chest x-rays. This preliminary data so plainly demonstrated the life-saving efficacy of LDCT scans, that the researchers felt ethically compelled to release its results ahead of schedule. (*See* Ex. A [NLST Press Release]). Unsurprisingly, centers of excellence are offering LDCT scans as a surveillance tool, including Massachusetts General and Brigham and Women's in Boston.

These developments eviscerate Philip Morris' original argument that the efficacy of LDCT surveillance is unknown. However, recognition that LDCT surveillance can save lives hardly demonstrates that a cash award to the class members would be appropriate, let alone an "adequate remedy at law." In that regard, Philip Morris essentially ignores the threshold question of what constitutes an "adequate remedy at law." However, it is well settled that:

> In order to preclude the granting of relief by the equity court, an available remedy at law must be plain, clear and certain, prompt or

> speedy, sufficient, full and complete, practical, efficient to the attainment of the ends of justice, and final. It has long been a principle of equity jurisprudence that the mere existence of a possible remedy at law is not sufficient to warrant denial of equitable relief. . . . [J]urisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances.

*Interstate Cigar Co. v. United States*, 928 F.2d 221, 223 (7th Cir. 1991) (citations and quotations omitted).[4] Notably, the standard under Massachusetts law is essentially identical. *See McGrath v. C. T. Sherer Co.,* 195 N.E. 913, 917 (Mass. 1935) ("An adequate remedy at law which will deprive a court of equity of jurisdiction is a remedy as certain, complete, prompt and efficient to attain the ends of justice as the remedy in equity."); *Karcher v. Burbank*, 21 N.E.2d 542, 546 (Mass. 1939) (same).

Applying those principles to the case at hand, Philip Morris has not come close to demonstrating that a cash remedy constitutes an "adequate remedy at law." No competent expert has ever opined, nor is it the case, that putting money into the hand of roughly 40,000 Massachusetts residents to purchase LDCT scans on the open market would be advisable, let alone preferable to the establishment of a program. Instead, Plaintiffs' medical experts all agree that providing the lung cancer screening at issue to the certified class warrants establishment of a program with administrative oversight to ensure initial outreach and continued participation in the program. (*See* Ex. B [Miller Rep.] at ¶50; Ex. C [Markowitz Rep.] at pp.3-4; Ex. D [Oliver Rep.] at pp.7-8; Ex. E [Markowitz Dep., 12/15/06] at pp.101-112; Ex. F [Miller Dep., 11/30/06] at pp.157-166; *see also* Ex. G [Kinsella Rep.] [addressing outreach component of program]). Not only must technicians and radiologists take and interpret the scans, but it is also essential that clinicians provide

---

[4] *See also American Life Insurance Co. v. Stewart*, 300 U.S. 203, 214 (1937) ("A remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient."); *Gormley v. Clark*, 134 U.S. 338, 349 (1890) ("The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would afford under the same circumstances") (citation omitted); *United States v. Ricketts*, 2002 U.S. Dist. LEXIS 13198, *10 (W.D. Mich. July 16, 2002) (same); *United States v. Bluitt*, 815 F. Supp. 1314, 1317-18 (N.D. Cal. 1992) (same); *Jones v. Fenton Ford, Inc.*, 427 F. Supp. 1328, 1337 (D. Conn. 1977) (same).

8

participants with informed consent, examine class members, and prescribe the scans, or in some few cases, to advise against scans. (*Id.; see also* Ex. H [Oliver Dep., 6/9/11] at pp.391-95]). Clinicians are likewise required to receive the radiologists' reports and counsel class members respecting what steps need to be taken, including referral for diagnostic work-up, or return for repeat scans annually or sooner. (*Id.; see also* Ex. I [Pass Dep., 6/8/11] at pp. 20, 57-59). Certain class members also lack primary care physicians, and/or have primary care providers who are not fully informed about LDCT scans, and would greatly benefit from access to program clinicians who are familiar with recent developments in this field. *See Donovan*, 268 F.R.D. at 26 (*citing* D. 64-31 [2008 Oliver Dep.] at 228:5-20).

It is also critical to have a proper algorithm to insure that the screening process identifies suspicious findings, and works up "indeterminate" findings carefully so that cancers are identified early, without subjecting others who prove to be without cancer to unnecessary invasive procedures. (*See, e.g.,* Ex. C, pp. 3-4; Ex. D, pp. 7-8; Ex. E, pp. 101-112; Ex. F, pp. 157-66; Ex. H, pp. 355-56; Ex. I, pp. 55-60; Ex. J [Oliver Dep., 3/4/08], pp. 70-74, 155-160; Ex. K [Grenier Dep., 5/14/08], pp.142-143; Ex. L [McCunney Dep., 6/12/08], pp.85-91; Ex. M [Goodman Dep., 1/30/07], pp.35-36, 183-187). Numerous large scale studies that have been underway for many years have developed well thought out algorithms that should be emulated. (*See, e.g.,* Ex. J, pp.70-74, 155-160; Ex. N [Schick Dep., 1/28/11], at pp.22-23, 31-34). Nonetheless, the process of working out and improving this algorithm is, as are all medical practices, ongoing, and will improve in the light of experience. (*Id.*)

Simply providing money to class members and sending them out to buy scans (assuming this can be done at all) would result in many class members going to inexperienced practitioners, lacking a proper appreciation of what the proper algorithm might be. The results would be unfortunate, not least because referrals out for suspicious findings would not necessarily be to skilled pulmonologists,

9

oncologists or surgeons who have the ability to perform a diagnostic work up. (*See, e.g.*, Ex. K, L, M, N.)[5]

Questions of quality control, record-keeping, follow-up, and the ability to assess ongoing developments in screening technology and technique also require a program. (*See* Ex. C, p. 4-5; Ex. O [Markowitz Dep., 6/7/11], pp. 32-33, 40, 95; Ex. I, pp. 55-59; Ex. N, pp. 52-53). Issues which will evolve over time (*e.g.,* at what age should the elderly at-risk individuals no longer be screened; should interval screens occur annually as is presently the case, or more or less frequently; should the use of PET scans be added to the algorithm to refine further the ability to work up certain "indeterminate" nodules) likewise require a program, with capable medical administration, so that as the algorithm evolves, class members will all receive the benefit of any progress. (*Id.; see also* Ex. O, pp. 32-33, 40, 95). Here too, a money remedy does not achieve this goal.

Philip Morris was unable to identify a single competent expert willing to testify that this newly approbated form of surveillance should be offered to the certified class through the award of money. Their sole claimed exception, Dr. Robert Schick, does not come close to asserting that a cash award to class members to purchase LDCT scans on the open market would be appropriate or preferable. Rather, his testimony -- and the out-of-context sound bites Philip Morris takes from the recent deposition of plaintiffs' expert Dr. Oliver -- merely stand for the proposition that there are a number of radiologists and machines in Massachusetts which might be utilized to offer LDCT surveillance to the class population (Decert. at 10-11). However, that does not begin to answer the

---

[5] Philip Morris' claim that class members could all easily obtain scans in the open market because the class representatives did also does not withstand scrutiny. The class representatives had the benefit of guidance from eminently qualified experts, such as L. Christine Oliver M.D., who are intimately familiar with the nature and benefits of LDCT surveillance. Absent the creation of a program, the same will surely not be the case for the class members at large.

question of whether a cash award is appropriate, efficient, and complete relief, such as to constitute an "adequate remedy at law."[6]

Furthermore, a programmatic remedy also has the important benefit of collectively pooling information for purposes of ongoing scientific research. (Ex. P [Grannis Rep.], ¶119; Ex. D, at p.8). This data would facilitate research, *inter alia*, into growth patterns for tumors, biologic behavior of non-solid pulmonary lesions, and the molecular biology of early lung cancer. (Ex. P, ¶119). In a population like the certified class, which both sides' experts agree are at elevated risk of developing lung cancer, facilitating such research is of tremendous importance.

The need for programmatic relief is still more apparent when one considers that Plaintiffs seek a class remedy to be made available to a group of individuals whom the parties' experts calculate to number as many as 40,000 individuals. (Ex. Q [Epstein-Oster Report]). Even if it may be possible for a single individual to obtain a prescription for an LDCT scan and obtain one at the Massachusetts General Hospital, Beth Israel or Brigham and Women's Hospital, that hardly means that handing over several hundred million dollars to forty thousand individuals, and sending them forth to purchase scans, would result in their obtaining a meaningful or complete remedy.[7]

In short, the record evidence amply refutes any claim that a cash award would constitute an adequate remedy at law. Intervening factual developments do nothing to undercut the correctness of the Court's holding on that topic. Instead, Plaintiffs respectfully submit that their Motion to Strike

---

[6] Additionally, by his own admission, Dr. Schick had never run nor designed a monitoring program, nor had he designed a monitoring algorithm, nor did he demonstrate any knowledge about the existing LDCT algorithms. (Ex. N, pp. 17-18, 23). Moreover, at his deposition, it became abundantly clear that Dr. Schick (although lacking proper qualifications to speak to the subject) agreed with experts for Plaintiffs and Philip Morris alike that should a remedy be fashioned, it would require a programmatic form. (*Id.*, pp. 21-23, 31-34).

[7] Notably, Philip Morris' claim that the Supreme Judicial Court of Massachusetts held that injunctive relief is improper in this action (Decert. at 4) also was previously raised (*see, e.g.*, D. 114 at pp. 2-5) and rejected by the Court. As explained in its class certification ruling, although the Supreme Judicial Court expressly declined to address the proper scope of a class remedy, it rejected a traditional money damage remedy even in the context of medical monitoring actions initiated by individual plaintiffs. Instead, it endorsed the establishment of a court-supervised fund-type remedy, permitting refund in the event of an individual's non-participation or under-participation in a monitoring program. *See Donovan*, 268 F.R.D. at 23-25.

Philip Morris' Thirty-Sixth Affirmative Defense (respecting the adequacy of a remedy at law) should be granted. Insofar as the Court harbors any doubts on this question, however, Plaintiffs would welcome the opportunity to submit their expert evidence at a hearing concerning the propriety of injunctive relief.

In seeking to reverse the Court's 23(b)(2) certification Order, Philip Morris also revives its prior unsuccessful argument (*see* D. 72 at pp.30-33; D. 114 at pp. 2-5) that Plaintiffs are merely seeking money damages because it would cost money to provide the class members with LDCT surveillance. In support of that argument, Philip Morris points to the report of Arnold Epstein M.D. and Gerald Oster, Ph.D., wherein Plaintiffs' experts proffered an estimate concerning the costs associated with establishing a surveillance program. Once again, this issue already has been addressed repeatedly by the parties, *see supra* n.1 (detailing previous briefing on this topic), and rejected by the Court. As it recognized:

> Simply because an injunction requires the defendant to pay money does not convert it into a monetary action. First, injunctive relief includes both mandatory and prohibitory orders. But most significantly, nearly all injunctions cost money in one way or another. "[I]n contemporary times, almost everything costs something. An injunction which does not compel some expenditure or loss of monies may often be an effective nullity." The 23(b)(2) test is not whether an injunction costs money but whether injunctive relief predominates.

*Donovan,* 268 F.R.D. at 27 (citing cases). Simply put, the injunctive nature of the remedy is by no means called into question by the fact that Plaintiffs' eminently qualified experts have offered an estimate as to the costs that such a program might involve.

Finally, Philip Morris' claim that monetary relief "predominates" over injunctive relief in this action can also be quickly put to rest (Decert. at 9-10). This argument is apparently based on the report of Drs. Epstein and Oster, wherein they opine that the majority of programmatic costs would

ultimately flow to medical providers. However, the notion that the Epstein-Oster Report demonstrates the "predominance" of monetary claims makes no sense. This is not a hybrid action, in which plaintiffs seek both a cash award for pain and suffering or lost earnings and the establishment of a medical monitoring program. *Cf. Dukes, supra*, 131 S. Ct. at 2548 (noting that plaintiffs sought punitive damages, backpay, injunctive, and declaratory relief). Rather, the *sole* relief that Plaintiffs seek is the provision of medical monitoring surveillance to a class at high risk for developing lung cancer. It makes perfect sense that medical providers performing and interpreting the scans should be compensated for their work. It is equally clear that, if the program is efficiently administered, those services will represent a significant share of the pertinent costs. At the same time, the establishment of a program with an administrative structure remains the critical way of ensuring outreach, follow-up, and a host of other quality control issues addressed *supra*. A medical monitoring program is not transformed into a "remedy at law" merely because its critical administrative components are designed to be efficient rather than inflated.

In sum, this class was properly certified pursuant to Fed. R. Civ. P. 23(b)(2). Philip Morris' contrary claim reflects nothing more than its dissatisfaction with an adverse outcome.

## II.   PHILIP MORRIS' UNAVAILING ARGUMENTS CONCERNING ALLEGED "INDIVIDUAL ISSUES" WERE PROPERLY REJECTED BY JUDGE GERTNER

Next, Philip Morris contends that two supposed individual issues – "medical necessity" and proximate cause – warrant decertification (Decert. at 12-21). In advancing those claims, Philip Morris ignores the host of other issues, subject to class-wide resolution, which render certification proper under Fed. R. Civ. P. 23(a). Beyond that, the two issues flagged by Philip Morris were raised, fully considered, and properly rejected in the Court's class certification opinion. Nothing that has transpired since then renders that ruling unsound. Instead, Philip Morris' argument consists of old wine in new bottles, using an inapposite case as a pretext to revisit a correctly decided decision.

13

At the outset, Philip Morris' "commonality" challenge rests on a misunderstanding of Fed. R. Civ. P. 23 and *Dukes*. Pursuant to Rule 23(a)(2), certification is proper, *inter alia*, if "there are questions of law or fact common to the class." Nowhere does the Rule suggest that all issues must be common for certification to be granted. To the contrary, *Dukes* reaffirmed that "for purposes of Rule 23(a)(2) even a single common question will do." 131 S. Ct. at 2556 (citations and quotations omitted). As discussed *supra*, class certification was found to be improper in *Dukes* because the Court concluded that not a single common issue existed. *Id.* It reached that conclusion because the injury alleged, discrimination, happened at the hands of different supervisors, at different levels of Wal-Mart's hierarchy, in different regions, at 3,400 different stores nationwide, without the link of a common practice or policy. *Id.* at 2557.

In sharp contrast, the instant case is premised on allegations that single brand, Marlboro, was defective. Additionally, all class members have smoked Marlboro cigarettes in Massachusetts, and have crossed a threshold of Marlboro use such that they are at dramatically increased risk of developing lung cancer. Philip Morris does not seriously dispute that several critical issues are subject to class-wide determination. They include the class members' common exposure to a hazardous substance, tar, since class members by definition have been exposed to tar at levels well above background levels. (*See* Ex. R [Morobia Rep.], pp. 6-7, 10-19; Ex. D, p. 3). Philip Morris' misconduct in the design of Marlboros is also subject to common proofs, as is the plaintiffs' "injury," since uncontroverted expert testimony shows that all twenty-pack-year smokers over fifty years old suffer from subcellular changes to their lungs that substantially increase their likelihood of developing cancer. (*See* Ex. S [Farone Rep.]; Ex. B at 3; Ex. T [Miller Dep., 1/12/2010], pp. 90-115; Ex. L, pp. 103-104, 118-125).  The question of whether LDCT surveillance is an efficacious form of medical surveillance is likewise common to the class. *Donovan*, 268 F.R.D. at 29. Consequently, even

14

if there were any merit to the claims advanced in Philip Morris' decertification motion (which there is not), the commonality requirement would nonetheless be satisfied.

In reality, however, neither of the topics raised by Philip Morris constitutes an individual issue, as the Court already found. Turning first to Philip Morris' discussion of "medical necessity," that phrase is taken from a federal court opinion addressing Pennsylvania law. *See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264-265 (3d Cir. 2011). It is not the language utilized by the Supreme Judicial Court when it articulated the elements of a medical monitoring claim in Massachusetts. Instead, the Supreme Judicial Court framed the inquiry as whether LDCT scans are "reasonably (and periodically) necessary conformably with the standard of care" for the plaintiffs seeking medical monitoring, *Donovan v. Philip Morris USA, Inc.*, 914 N.E.2d 891, 902 (Mass. 2009).

The Court's class certification opinion directly addressed that language, and rejected Philip Morris' argument (*see* D. 114 at pp. 13-14) that plaintiffs could not establish that LDCT screening is "reasonably necessary" on a class-wide basis. *Donovan*, 268 F.R.D. at 16-17. As before, Philip Morris cannot identify a single expert who challenges the proposition that offering periodic efficacious lung cancer surveillance would be reasonably necessary for all persons over 50, with 20 pack-years of Marlboro use. Plaintiffs' experts universally hold the contrary view, and agree that the class consists of persons who are uniformly at high risk of lung cancer. (*See, e.g.*, Ex. B at V; Ex. D, p. 3; Ex. R, pp. 6-7, 10-19). Moreover, when questioned about that topic at depositions, Philip Morris' experts have consistently agreed. (*See, e.g.*, Ex. N, pp. 25:22-26:9; Ex. L, pp. 103-104). Thus, concerns about differential exposure, which have proved problematic in certain other medical monitoring actions, have been eliminated here by defining a class whose members are unquestionably at high risk on account of their smoking histories.[8]

---

[8] Thus, *Gates v. Rohm & Haas Co.*, *supra*, 655 F.3d at 255, on which Philip Morris relies, is wholly inapposite. Briefly, the plaintiffs in *Gates* alleged that they had been wrongfully exposed to a carcinogen via a shallow aquifer into the air. In addition to property damages, they sought to certify a medical monitoring class consisting of virtually every

The poverty of Philip Morris' "medical necessity" argument is revealed by that consensus between the parties' experts. No competent expert disputes that twenty pack-year smokers over fifty years of age would benefit from efficacious surveillance for lung cancer. Instead, at bottom, Philip Morris is asking this Court to decertify the class because a minute number of persons within the class definition might not be advised to immediately obtain a scan if Plaintiffs prevail. Even if that were true, it would be immaterial. As the Court already found, "[t]he remedy plaintiffs seek is a program that invites medical personnel to manage it and its participants. They would surely ask preliminary medical questions before performing the scan to ensure its safety for the patient. As in any medical monitoring program, some variation among patients is built into the program." *Donovan*, 268 F.R.D. at 16-17.

Ultimately, it matters not whether a *de minimus* number of class members might have characteristics which militate against immediate screening, chiefly the terminally ill and those who are so morbidly obese that they cannot fit into the scanning machine. Those issues are a function of available technology, and not a failure to prove the underlying case. There is no requirement that the relief in a 23(b)(2) class seeking programmatic relief establish to a mathematical certainty that every last human will avail himself of the proffered remedy. Moreover, since even the tiny subset of the class flagged by Philip Morris remains at substantially increased risk of developing lung cancer, a surveillance program would benefit them if and when their co-morbidities abate, or a scanner is developed capable of accommodating their size. This too reinforces the importance of establishing a

---

person who had lived within the allegedly affected area for one year or more in total (consecutively or not) between 1968 and 2002. *Id.* at 259. The plaintiffs' allegations that any person living in the designated area for a single year warranted medical monitoring were based on imprecise "[a]verages or community-wide estimations" of exposure, which did not reflect the characteristics of class members. *Id.* Notably "under the plaintiffs' proposed modeling and isopleths, a class member who lived in the village from 1988-89—a full decade after the dumping ended—would be assumed to have been exposed to the same concentration of vinyl chloride as a person living in the same neighborhood from 1968-69 when dumping occurred." *Id.* at 267. The plaintiffs also "failed to propose a method of proving the proper year point where exposure to vinyl chloride presents a significant risk of developing a serious latent disease, and, "[n]one of [the] plaintiffs' experts [even] addressed how medical monitoring would proceed." *Id.* at 268-69. On those facts, it is hardly surprising that certification was denied. For the many reasons discussed above and in Plaintiffs' prior submissions, the instant case is entirely different with regard to both causation and "medical necessity."

programmatic remedy. Furthermore, as discussed *supra*, the program at issue has the important benefit of collectively pooling information for purposes of ongoing scientific research into growth patterns for tumors, biologic behavior of non-solid pulmonary lesions, and the molecular biology of early lung cancer. (Ex. D, p.8; Ex. P, ¶119). Thus, all class members, who are by definition at high risk of developing lung cancer, stand to benefit from the research facilitated by the programmatic remedy.

Furthermore, the case-by-case approach proposed by Philip Morris is particularly senseless because the Supreme Judicial Court anticipated and addressed the possibility that some of the funds allocated for medical monitoring would not be employed.  On that score, the Court provided that, to the extent that funds set aside for medical monitoring were not utilized, they could be returned to the defendant.  *See Donovan*, 914 N.E.2d at 902, n.12 (citations omitted). Thus, Philip Morris has a form of recourse available to it to recover any excess funds even assuming *arguendo* that a tiny number of terminally ill or morbidly obese class members will not be screened.

Philip Morris' renewed argument that "proximate causation" constitutes an individual issue is equally unavailing, once again for reasons already addressed by the Court. *Donovan*, 268 F.R.D. at 14-16. As before, Philip Morris does not deny that Plaintiffs can demonstrate its egregious misconduct in the design and marketing of Marlboros through common proofs. Nor does it seriously dispute the fact that all class members have subcellular injuries as a result of smoking Marlboros, which place them at significantly elevated risk of developing lung cancer. (*See* Ex. B, at V.; Ex. D, p. 3; Ex. N, pp. 25:22-26:9; Ex. R at I; Ex. T).

Nonetheless, Philip Morris renews its earlier argument (*see* D. 72 at pp. 36-39; D. 114 at pp. 9-12) that causation is an individual issue barring certification. As the Court has already explained at some length, this position is premised on a mischaracterization of Massachusetts law. Specifically, Philip Morris incorrectly assumes that each class member must prove that a) she would have

17

smoked a feasible alternative design instead of Marlboros, and b) smoking it would have eliminated

any risk of lung cancer or need for screening.

Neither assumption is correct. As the Court held,

> Massachusetts law only requires the plaintiff to show that 'an
> available design modification . . . would *reduce* the risk the risk.' *Colter
> v. Barber-Greene Co.*, 403 Mass. 50, 525 N.E.2d 1305, 1310 (Mass.
> 1988) (*quoting Uloth v. City Tank Corp.*, 376 Mass. 874, 384 N.E.2d
> 1188, 1193 (Mass. 1978) (emphasis added)); see *also Simmons v.
> Monarch Mach. Tool Co., Inc.*, 413 Mass. 205, 596 N.E.2d 318, 322-23
> (Mass. 1992) ("We previously have rejected the notion, however, that
> liability for negligent design is limited to situations where the design
> defect was the causative factor of an accident. Rather, liability will
> also attach where the design defect enhances the injuries a person
> sustains in an otherwise foreseeable" way), *abrogated on other grounds,
> Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 696 N.E.2d 909, 922
> (Mass. 1998); *Smith v. Ariens Co.*, 375 Mass. 620, 377 N.E.2d 954, 956-
> 58 (Mass. 1978) (holding that manufacturer may be liable for design
> defects that enhance rather than cause injuries); *Lally v. Volkswagen
> Aktiengesellschaft*, 45 Mass. App. Ct. 317, 698 N.E.2d 28, 38 (Mass.
> App. Ct. 1998) (Product liability may be premised on "existence of
> some enhanced injury, i.e., an injury 'over and above' that which
> would have been sustained in the absence of the alleged defect.").

*Donovan*, 268 F.R.D. at 14. No intervening development in Massachusetts law remotely undercuts

the correctness of that analysis.[9]

It is equally clear that "Massachusetts design defect law does not require proof that the

plaintiff would have used the alternative design had it been available." *Id.* at 15 (*citing Lally v.

Volkswagen Aktiengesellschaft*, 698 N.E.2d 28, 38 (Mass. App. Ct. 1998)). "Rather than proving that the

plaintiff would have used the alternative design, '[t]he plaintiff need only convince the jury that a

safer alternative design was feasible, not that any manufacturer in the industry employed it or even

---

[9] The sole case Philip Morris cites for the contrary proposition, *Gillespie v. Sears Roebuck & Co.*, 386 F.3d 21 (1st Cir. 2004) -- which both predates the class certification opinion, and was considered by the Court (*Donovan*, 268 F.R.D. at 14) -- is wholly inapposite. *Gillespie* was a product liability case in which the proposed alternative design -- a modification to a saw guard -- would not have reduced the risk of injury the plaintiff sustained, because it could not have been utilized to perform the type of cut being performed at the time when the plaintiff was injured. 386 F.3d at 27. Nothing about *Gillespie* undercuts the Court's correct articulation of settled Massachusetts law regarding proximate causation which is quoted above.

contemplated it.'" *Id.* (*citing Haglund v. Philip Morris, Inc.*, 847 N.E.2d 315, 323 (Mass. 2006); *Marchant v. Dayton Tire & Rubber Co.*, 836 F.2d 695, 699 n.2 (1st Cir. 1988) ("The alternative [design] need not be in fact available . . . . The . . . test is one of feasibility. . . . All the jury must find is that a more reasonable design than the one in question could have been produced.")). Here too, Philip Morris' mischaracterization of Massachusetts design defect law was expressly noted by the Court. *See Donovan*, 268 F.R.D. at 15.

In short, the legal premises underpinning Philip Morris' proximate causation challenge were properly rejected, as they are inconsistent with Massachusetts jurisprudence. Beyond that, there is no merit to the factual underpinnings of Philip Morris' "causation" argument. At its core, Philip Morris contends that the causation inquiry will vary based on how the individual class member smokes, because some smokers "compensate" and some do not (Decert. at 18-21). In making that claim, however, Philip Morris ignores feasible alternative designs discussed by Plaintiffs' experts. Plaintiffs' case is not premised on the notion that Philip Morris should have designed and marketed a "light" cigarette with a lower nominal reading on FTC testing machines, but which easily permitted smokers to "compensate" by covering filter holes or marginally increasing their cigarette consumption. Such "low tar" cigarettes were designed by Philip Morris and its competitors, but the "compensation" they intentionally allowed tended to nullify the health benefits they appeared to offer. The nature of that fraud forms the basis of numerous actions against the tobacco industry. *See, e.g., Unites States v. Philip Morris*, 449 F. Supp. 2d 1, 1095 (D.D.C. 2006); *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 492 (Mass. 2004).

Those are not the "feasible alternative designs" addressed in Plaintiffs' expert submissions. Instead, Plaintiffs have submitted proofs showing that Philip Morris could have marketed a safer cigarette designed to actually deliver fewer tars. Plaintiffs have offered competent expert proofs on this topic, speaking to the viability of such alternative designs, and their dramatic potential to

19

decrease actual tar consumption. (*See* Ex. S [Farone Rep]). Philip Morris cannot demonstrate that the safer alternative designs proposed by Plaintiffs' experts would place the class members at sufficient risk of developing lung cancer to warrant surveillance. The tar delivery is sufficiently low that no amount of smoking would be sufficient to cross the threshold necessary to render surveillance advisable.

In fact, Philip Morris does not dispute that it created a cigarette that achieved the characteristics outlined above, called the Original Lowest Cambridge ("OLC"). (*See* Philip Morris' Answer to Plaintiffs' Third Amended Complaint (D. 30) at ¶¶60-61). The OLC delivered "less than .1" mg of tar to the smoker, and was "intentionally design[ed] to prevent compensation." (Ex. U [Farone Dep., *Mulholland v. Philip Morris*, 9/19/06], pp. 93:20-23, 105:9-19). It utilized "57 [design] parameters," including "very high ventilation . . . high resistance to draw, [and a] very tight packed filter" which serve to prevent smoker compensation. (*Id.* at 106:3-22). The effect of this design is the reduction of a smoker's risk of contracting lung cancer from "1 in 7" -- when smoking a cigarette on the market today -- to "less than 1 in 100,000." (*Id.* at 93:4-94:18). Thus, even assuming *arguendo* that Plaintiffs bore the burden under Massachusetts law of demonstrating but for causation (which they do not), it would be satisfied by the proofs in this action.[10]

In sum, the alleged "individual issues" identified by Philip Morris are in fact common to the class, as the Court already found. Philip Morris can point to no intervening factual or legal events warranting reconsideration of the correctly decided ruling.

---

[10] Philip Morris' reliance on the *Caronia* and *Gargano* opinions in its proximate causation argument (Decert. at 18-20) is also misplaced. First and foremost, neither of those opinions addressed Massachusetts law, which governs this action. *Donovan*, 268 F.R.D. at 18-19. Beyond that, the *Caronia* Court was mistaken in its interpretation of New York law, which does not and has never required a showing of "but for" causation. *See, e.g., Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 207 (N.Y. 1983) (articulating "substantial factor" causation standard in New York); *Derdiarian v. Felix Contractor Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980) (same); *Nallan v. Helmsley-Spear, Inc.*, 407 N.E.2d 451, 459 (1980). An appeal on that subject has been briefed in the Second Circuit.

## III.   PHILIP MORRIS' RENEWED ASCERTAINABILITY OBJECTION LACKS MERIT

Philip Morris further contends that this class should be decertified because it is not "ascertainable." As it is constrained to admit, it already made (D. 72, pp. 36-39; D. 114, pp. 5-7), and the Court already rejected, precisely the same arguments. *Donovan*, 268 F.R.D. at 9-10. No development since this class was certified warrants reconsideration of the Court's ruling. Quite to the contrary, Philip Morris conspicuously fails to address significant new disclosures in this very action, which affirmatively reinforce the propriety of Judge Gertner's original conclusion. Simply put, Philip Morris' renewed "ascertainability" challenge lacks merit.

As a threshold matter, it is noteworthy that neither *Dukes* nor Fed. R. Civ. P. 23 mentions "ascertainability," and "most courts do not [even] independently address" whether a class is ascertainable. *See Donovan*, 268 F.R.D. at 9. The concept has arisen in class actions seeking monetary damages, where class members are entitled to notice and an opportunity to opt out. Fed. R. Civ. P. 23(c)(2). The same is not true for injunctive actions proceeding under Fed. R. Civ. P. 23(b)(2). The Advisory Committee Notes to the Federal Rules reflect this distinction. They state that "[i]llustrative [of 23(b)(2)] are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members *are incapable of specific enumeration*." Fed. R. Civ. P. 23(b)(2) Advisory Committee Notes to the 1966 Amendment (emphasis added); *see also J.S. v. Attica Cent. Schs*, No. 00-CV-513S, 2007 U.S. Dist. LEXIS 100754 (W.D.N.Y. Sept. 23, 2007) (same). Consistent with that language, federal courts have frequently held that "ascertainability" creates no barrier to certification in Fed. R. Civ. P. 23(b)(2) classes seeking injunctive relief. *See, e.g., Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004) (*citing Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972)); *Battle v. Pennsylvania*, 629 F.2d 269, 271 n.1 (3d Cir. 1980); *Haynes v. Dart*, 2009 U.S. Dist. LEXIS 65742, *12 (N.D. Ill. July 29, 2009); *Stewart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008); *Finch v. N.Y. State Office of Children & Family Servs.*, 252 F.R.D. 192, 198 (S.D.N.Y.

2008); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 630 (C.D. Cal. 2007); *Rice v. City of Phila.*, 66 F.R.D. 17, 19 (E.D. Pa. 1974).

In any event, assuming that "ascertainability" must be established in this action, the Court already found that the instant class is ascertainable. As it explained, "ascertainability" simply addresses whether a class is defined by reference to "stable and objective" criteria. *Donovan*, 268 F.R.D. at 9-10.[11] There is no requirement that all class members be identified at the outset of the litigation. *Id.* at 9. *See also In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 280 (D. Kan. 2010); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 629-630 (C.D. Ca. 2007); *Joseph v. General Motors Corp.*, 109 F.R.D. 635, 639 (D. Colo. 1986). Rather, since the primary concern "is that the proposed class not be amorphous, vague, or indeterminate[,]" certification is appropriate so long as "it is administratively feasible to determine whether a given individual is a member." *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D. Mo. 1985) (citations omitted). *Compare Crosby v. Soc. Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (class defined as consisting of disability benefits claimants who did not receive a hearing "within a reasonable time" was impossible to ascertain in an objective fashion); *with In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 22-25 (D.D.C. 2001) (rejecting claim that complexities of pharmaceutical market render purchasers of drugs "unascertainable," and collecting cases certifying classes of direct purchasers in complex markets). *See also In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 93 (D. Mass. 2005).

---

[11] Philip Morris' contrary claim -- that the Court's focus on the existence of "objective criteria" in finding that this class was ascertainable was somehow mistaken -- is belied by a host of authorities. *See, e.g. In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 263, 280 (D. Kan. 2010) (citing *Donovan* opinion and rejecting ascertainability objection because "general outlines of class membership [were] based on stable and objective factors"); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y. 2005) ("An identifiable class exists if its members can be ascertained by reference to objective criteria.") (citation omitted); *Lindquist v. Farmers Ins. Co.*, 2008 U.S. Dist. LEXIS 11832, *9-10 (D. Ariz. Feb. 6, 2008) (noting that "class members can be identified by objective criteria that are contained in the claim files maintained by Defendants"); *Gomez v. Illinois State Bd. of Education*, 117 F.R.D. 394, 397 (N.D. Ill. 1987) ("An identifiable class exists if its members can be ascertained by reference to objective criteria"). Insofar as it holds otherwise, the California opinion on which Philip Morris relies is an outlier, and should not be followed.

The instant class -- consisting of Massachusetts residents over fifty years of age who have amassed a twenty pack-year history of smoking Marlboros -- clearly satisfies that standard, as the Court already found. *Donovan*, 269 F.R.D. at 9-10. Age and residence are both objective facts, which can be administratively established.  The status of being under investigation for lung cancer is also an objective fact, easily ascertained, and one which does not require meaningful investigation. Medical records or a treating physician's declaration would conclusively establish whether a class member is under investigation for lung cancer. *Donovan*, F.R.D. at 9-10. (*See also* Ex. F., pp. 48:23-49:7; Ex. V [Grannis Dep., 12/20/06], pp. 52-53). Moreover, those suffering from lung cancer would not desire a scan. Nor would someone under investigation for lung cancer submit to a procedure which would refer him for a medical workup already in progress. *Donovan*, F.R.D. at 9-10 ("[P]otential class members who are already suspected of having lung cancer would have little incentive to lie about their situation [as m]edical monitoring would not benefit them. Presumably, they are already about to undergo or are in the midst of far more intensive screening and treatment.").

That leaves the question of 20 pack-years of Marlboro use. Here too, the class is defined in objective terms, and is capable of administrative resolution. Extensive demographic data exist concerning age and brand use of smokers, verifying the class size. Indeed, the parties' experts are in essential agreement about the size of the proposed class. (*Compare* Ex. Q, p. 7, *with* Ex. W [Philipson Rep.], pp. 27-40). That evidence would permit fashioning of the programmatic remedy, and define Philip Morris' burden. (Ex. Q). Thereafter, individuals seeking to avail themselves of the programmatic remedy can sign affidavits concerning their smoking history, and would have little reason to lie given the lack of pecuniary gain. There is simply no basis for concluding that meaningful numbers of aging Massachusetts residents would commit perjury in order to obtain a CT scan. *Donovan*, 268 F.R.D. at 10 ("[A]n illiquid remedy reduces the incentives for plaintiffs to falsely

claim relief not owed to them.") (*quoting* Note, The Class Certification of Medical Monitoring Claims, 102 Colum. L. Rev. 1659, 1693 (2002)).

Against this background, Philip Morris' ascertainability challenge rings hollow. Philip Morris claims entitlement under the due process clause and the Rules Enabling Act to tens of thousands of trials on whether individuals meet the class definition. If that were correct, then even a class action alleging race discrimination in university admissions could not be certified, since the court would have to conduct thousands of trials on whether putative class members belonged to the affected group. Philip Morris' approach would likewise bar a class of inmates or nursing home residents from seeking kosher or halal food, based on the difficulty of determining who belonged to the class, and the need to prevent others from receiving a "free meal." Such theoretical concerns plainly do not serve as a blanket obstacle to class certification, particularly in actions seeking injunctive relief. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 360 (D. Md. 2004); *Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 630 (N.D. Cal. 2010). In short, the District Court's finding that the instant class is ascertainable was rightly decided. Philip Morris has offered no basis for revisiting it.

Having sought decertification, however, it is noteworthy that Philip Morris declines to address recent developments in this action concerning class notice, as they reinforce the propriety of the Court's finding concerning ascertainability. At the time of certification, Plaintiffs were aware that Philip Morris had maintained a customer database for decades, which was used for various direct mail promotional activities. They included sending cigarette samples and coupons to smokers, and exchanging proofs of purchase from cigarette packages for Marlboro merchandise. (*See* Ex. X [Trial Testimony of Margolis, *Engle v. Philip Morris*], pp. 34714-34715, 34717, 34799). The database included customer names, contact information, and data respecting brand usage (*Id.* at 34798). As of 1997, it contained 25 million qualified individuals, who had certified that they were smokers over

21 years of age. (*Id.* at 34798-34801.) According to Philip Morris, the "Marlboro gear" program was "the third largest mail order business in the United States, comparable in scale to L.L. Bean and Land's End." (*Id.* at pp. 34933-34935).

Plaintiffs cited this evidence in response to Philip Morris' original ascertainability objection, arguing that the database could be culled to find individuals who were Marlboro smokers, and utilized during any class notice exercise. The Court agreed. *See Donovan*, 268 F.R.D. at 10 (rejecting ascertainability challenge, *inter alia*, because "Philip Morris itself possesses an objective way to determine the smoking history of many purported class members, namely, its internal database of long-term customer information, the Marlboro Miles Program. . . .").

Moreover, to reinforce this conclusion, well after this class was certified (and after the *Xavier* action was dismissed), Philip Morris finally commenced its response to outstanding discovery demands concerning its Marlboro Miles program. It did so with great reluctance under Court Order, in connection with the question of class notice, and discovery on this topic remains incomplete to this day. (*See* June 20, 2011 Electronic Court Order (directing Philip Morris to turn over Marlboro Miles customer lists to Plaintiffs); D. 265 (Philip Morris' Motion for Clarification and Reconsideration); July 8, 2011 Electronic Court Order (directing Philip Morris to provide a list of customers in Massachusetts over fifty years of age with addresses to Plaintiffs' consultant)).

However, disclosure to date reaffirms that Philip Morris maintains an extraordinarily robust up-to-the-moment customer database, tracking the names, ages, and various forms of contact information of Marlboro smokers. To illustrate, Philip Morris provided an Affidavit from an Altria Database Director confirming that "direct mailings are an important mechanism through which [Philip Morris] promotes its products to age verified adult cigarette smokers," which makes sense given the substantial restrictions placed on cigarette advertizing (Ex. Y [Margolis Aff.], ¶8). Thus, Philip Morris collects and inputs into its Adult Tobacco Consumer Database information about

adult cigarette smokers, to facilitate communication with its consumers regarding tobacco products and promotions. (*Id.* at ¶3). The first such database began over twenty-five years ago, and Philip Morris' current database contains records dating back to 1982. (*Id.* ¶4) Since 2003, Philip Morris also has sought and retained email addresses of adult Marlboro smokers, which are placed into the database as well. (*Id.* at ¶6). Philip Morris routinely updates its database to reflect address changes obtained from both the United States Postal Service and other "third party data sources," and likewise updates its information to remove individuals who have passed away (*Id.* at ¶4, 6). The Adult Tobacco Consumer Database is Philip Morris' "source of information about an adult smoker's historical involvement in [its] promotional and continuity programs, including the Marlboro Miles program it conducted until 2006." (*Id.* at ¶5).

Following two Court Orders, Philip Morris further revealed to Plaintiffs' counsel the number of individuals in its present Database who apparently satisfy the class definition. This information, while subject to a Protective Order, was revealed to Judge Gertner, and can be conveyed to this Court under seal as well. Suffice it to state, it vastly exceeds the class size, as estimated by Plaintiffs' and Defendant's experts. The names and contact information of these individuals have been provided to Plaintiffs' agent, should a class notice exercise prove necessary.

In the face of said developments, it is surprising that Philip Morris even sought to advance its ascertainability argument a second time. Unfortunately, Plaintiffs' counsel were largely ignorant of the scope and nature of Philip Morris' customer database at the time of the *Xavier* (and *Donovan*) class certification rulings, and thus could not place now available information before the District Court in California. Faced with incomplete disclosure, the Massachusetts Court certified the instant action, finding it ascertainable, while the *Xavier* Court disagreed in a companion action. Plaintiffs respectfully submit that Judge Gertner had the better of the argument concerning ascertainability, because this class is unquestionably defined in objective terms, and class membership can be

26

determined by administrative means. *Donovan*, 268 F.R.D. at 9-10. However, Philip Morris' disclosure concerning Marlboro Miles demonstrates to a fare-the-well that this class is ascertainable.

Without belaboring the point, Philip Morris' database is unquestionably robust, detailed, and contains information sufficient to corroborate class membership. Beyond that, nothing in Federal Rule 23 or *Dukes* suggests that Philip Morris is entitled to a trial on class membership. Nor does Philip Morris possess a due process right to individual trials on class membership in this action seeking injunctive relief – any more than it would be entitled to a trial on every single class member's age, race, or possession of shares in a given stock. To hold otherwise would render class actions an impossibility, either flooding the federal courts with a slew of small value claims, or (more likely) depriving injures parties of any redress whatsoever. That outcome is precisely what Rule 23 is designed to prevent. *See In re Lorazepam & Clorazepate Antitrust Litig.*, *supra*, 202 F.R.D. at 22-25 (rejecting claim that complexities of pharmaceutical market render purchasers of drugs "unascertainable," and noting that defendants' contrary argument "treads dangerously close to making the senseless point that no one may be sued for antitrust injury in the pharmaceuticals industry because it is too difficult to weed out the indirect purchasers").

In sum, the Court correctly found that Philip Morris' ascertainability challenge is devoid of merit.[12]

---

[12] Philip Morris further asserts in passing (Decert. at 24-25, n.12), that the class definition is deficient because its membership is "ever changing," and the Court will have to continually "reevaluate the roster of class members." That claim does not withstand scrutiny. The instant class was properly amended a single time in 2011 because the passage of five years, in which Philip Morris continued to market its defective product, increased the number of individuals entitled to relief under the record evidence. The same would be true in any action wherein a defendant voluntarily elected to engage in misconduct during the pendency of a suit. Additionally, there is no reason to conclude that class membership will require ongoing judicial reassessment, as Philip Morris suggests. Rather, as in any other surveillance action, those meeting the class criteria, if and when Plaintiffs prevail, would be eligible for access to the established medical monitoring program.

## IV.    PHILIP MORRIS' MOTION FAILS TO ADDRESS PLAINTIFFS' CHAPTER 93A CLASS

The Court granted Plaintiffs' motion for class certification as to both their implied warranty claim, and their claims under the Massachusetts consumer fraud statute, Mass. Gen. Laws ch. 93A. *Donovan*, 268 F.R.D. at 30-31.[13] It will hardly be lost on the Court that Philip Morris' decertification motion fails to even address Plaintiffs' Chapter 93A class.

That omission is not inadvertent. Chapter 93A is a statute of broad impact which created new substantive rights and new devices for the enforcement of those rights. *See States Res. Corp. v. Architectural Team, Inc.*, 433 F.3d 73, 84 (1st Cir. 2005); *Ciardi v. F. Hoffmann La Roche, Ltd.*, 762 N.E.2d 303, 308 (Mass. 2002); *Purity Supreme, Inc. v. Attorney Gen.*, 407 N.E.2d 297, 301 (Mass. 1980). It is well settled that Ch. 93A sec. 9(2) provides a basis for class certification which is independent of, and far less demanding than, that contained in Fed. R. Civ. P. 23. *See, e.g.*, Michael Gilleran, The Law of Chapter 93A (Mass. Practice Series v. 52) sec. 5.10 (2007 & Supp. 2010).

Additionally, the "expressions of [all] three branches of Massachusetts government indicate that the public policy of the Commonwealth strongly favors G. L. c. 93A class actions." *Feeney v. Dell*, 908 N.E.2d 753, 762 (Mass. 2009). The text and legislative history of Chapter 93A's class action provisions "demonstrate[] that the Legislature specifically intended to provide for the vindication of small-value claims." *Id.* The Supreme Judicial Court has further cautioned that, in deciding a request for class certification under 93A, trial judges "'must'" bear in mind the "'pressing need'" for an effective private remedy, and that "'traditional technicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice.'" *Id.* (*quoting Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004); *Fletcher v. Cape Cod Gas Co.*, 477 N.E.2d 116 (1985)). The Supreme Judicial Court has further held that "[t]he right to a class action in a consumer protection

---

[13] *See also Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010) (noting propriety of Plaintiffs' 93A claims in the instant action).

case is of particular importance where, as here, aggregation of small claims is likely the only realistic option for pursuing a claim." *Feeney*, 908 N.E.2d. at 762-63 (*citing Leardi v. Brown*, 474 N.E.2d 1094 (Mass. 1985)). Consistent with those principles, it has upheld class certification in an action brought against Philip Morris by its consumers under Chapter 93A. *See Aspinall v. Philip Morris Cos.*, 813 N.E.2d at 492 (Mass. 2004) ("We affirm the order of certification by the judge in the Superior Court of a class consisting of purchasers of Marlboro Lights cigarettes in Massachusetts during the four years preceding the filing of the plaintiffs' original complaint.").

Moreover, because §9(1) of Chapter 93A expressly authorizes injunctive relief, the Supreme Judicial Court has stated that the "adequacy of a remedy at law" does not even constitute a defense under this statute. *See Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 700 (Mass. 1975) ("It has long been the law that where equity jurisdiction is specifically conferred by statute, it is no objection that the plaintiff also has a plain, adequate, and complete remedy at law.") (citations omitted); *Linthicum v. Archambault*, 398 N.E.2d 482, 485 (Mass. 1979) (refusal to permit relief under c. 93A on the ground that the plaintiff had a "plain, adequate, and complete remedy at law" was erroneous); *Frank J. Linhares Co. v. Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 620 (Mass. App. Ct. 1976) (same). *See also Aerovox, Inc. v. Parallax Power Components, LLC (In re Aerovox, Inc.)*, 281 B.R. 419, 434 (Bankr. D. Mass. 2002) (discussing how availability of monetary damages "does not necessarily bar a suit in equity for specific performance" because "[w]hereas in many jurisdictions the legal remedies of damages and restitution are the preferred method of redressing breaches of contract, and specific performance is a remedy limited to real estate, Massachusetts law is more liberal with respect to the availability of specific performance"); *In re Pina*, 363 B.R. 314, 335 (Bankr. D. Mass. 2007) (same).

For the many reasons discussed *supra*, in Points I-III, Plaintiffs respectfully submit that Philip Morris' decertification Motion is wholly devoid of merit and should be denied. However, that conclusion is still more apparent when viewed through the lens of Chapter 93A, and the

Commonwealth's strong preference for consumer class actions. In light of that jurisprudence, Philip

Morris' claim that the certification Order in this case somehow runs afoul of Massachusetts law and

the Rules Enabling Act is baseless. The Rules Enabling Act is self-evidently not offended in a

diversity case by certifying a class in a manner entirely consistent with – and indeed, expressly

endorsed by – the underlying state's substantive law.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Decertification should be denied.


Dated: November 21, 2011              Respectfully submitted,

                                      /s/ Steven J. Phillips
                                      Steven J. Phillips (admitted *pro hac vice*)
                                      Victoria E. Phillips (admitted *pro hac vice*)
                                      LEVY PHILLIPS & KONIGSBERG, LLP
                                      800 Third Avenue, 11th Floor
                                      New York, NY 10022
                                      Phone: (212) 605-6200

                                      /s/ Christopher Weld
                                      Christopher Weld, Jr. (BBO # 522230)
                                      Edward Foye (BBO # 562375)
                                      TODD & WELD LLP
                                      28 State Street
                                      Boston, MA 02109
                                      Phone: (617) 720-2626

                                      /s/ Kevin T. Peters
                                      Kevin T. Peters (BBO # 550522)
                                      Arrowood Peters, LLP
                                      10 Post Office Square, Suite 1180-N
                                      Boston, MA 02109
                                      (617) 849-6200

                                      /s/ Michael A. Lesser
                                      David C. Strouss (BBO # 546253)
                                      Michael A. Lesser (BBO # 631128)
                                      Andrea Marino (BBO # 663932)
                                      THORNTON & NAUMES, LLP
                                      100 Summer Street, 30th Floor
                                      Boston, MA 02110

Phone: (617) 720-1333

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Steven J. Phillips, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 21, 2011.

/s/ Steven J. Phillips
Attorney for Levy Phillips & Konigsberg, LLP