UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
**KATHLEEN DONOVAN and PATRICIA**         )
**CAWLEY, on behalf of themselves and others**  )
**similarly situated,**                   )
                                          )
          **Plaintiffs,**                 )
                                          )
          **v.**                          )          **Civil Action No. 06-12234-DJC**
                                          )
**PHILIP MORRIS USA, INC.,**              )
                                          )
          **Defendant.**                  )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                          March 21, 2012

## I.      Introduction

       Defendant Philip Morris USA, Inc. ("Philip Morris") has moved to decertify the class

represented by named plaintiffs Kathleen Donovan ("Donovan") and Patricia Cawley ("Cawley")

(collectively, "the plaintiffs") and certified by the Court's June 24, 2010 decision in Donovan v.

Philip Morris USA, Inc., 268 F.R.D. 1 (D. Mass. 2010) (Gertner, J.) (Donovan II).  For the reasons

set forth below, the Defendant's motion is DENIED.

## II.     Background

       A.      Procedural History Prior to Class Certification

       On December 14, 2006, Donovan and Cawley brought suit against Philip Morris.  Their

complaint–filed on behalf of a purported class of Massachusetts residents who:  a) are age fifty or

older; b) have cigarette smoking histories of twenty pack-years[1] or more using Marlboro cigarettes;

c) currently smoke Marlboro cigarettes or quit smoking within one year of the filing of the

complaint; d) are neither diagnosed as suffering from lung cancer nor under investigation by a

physician for suspected lung cancer as of the date of any judgment entered or relief obtained in this

action; and e) have smoked Marlboro cigarettes in Massachusetts–accused Philip Morris of negligent

design and breach of the implied warranty of merchantability by marketing cigarettes that were

defectively designed and unreasonably dangerous.  D. 1 at ¶¶ 1, 79-100.  The complaint was

subsequently amended to include allegations of violations of the Massachusetts Consumer Protection

Act, Mass. Gen. L. c. 93A.  D. 2 at ¶¶ 102-12; D. 29 at ¶¶ 100-10.  The plaintiffs sought as relief a

court-supervised screening program involving low-dose computed tomography ("LDCT"), which

the plaintiffs alleged provides a means to identify and diagnose lung cancer at an early stage, when

it is still curable.  D. 29 at ¶¶ 2-3, 6-13 and page 22 ¶ B.[2]

On April 28, 2008, Philip Morris moved for judgment on the pleadings arguing that the

plaintiffs' claims required present physical injury and they had failed to allege such an injury and

Philip Morris moved separately for summary judgment on statute of limitation grounds.  D. 32; D.

34.  On July 1, 2008, while briefing proceeded on Philip Morris' motions, Donovan and Cawley

moved to certify their purported class.  D. 60.

---

[1] As noted previously in this litigation, a "pack-year" is the average number of packs of cigarettes smoked per day multiplied by the number of years the person has smoked.  One pack a day for twenty years, for example, equals twenty pack-years.  Donovan II, 268 F.R.D. at 5 n.1.

[2] Given the voluminous filings in this case, when citing to specific pages of documents the Court will rely on the uniform Electronic Case Filing ("ECF") pagination inserted by the clerk's office and found at the top of each page of docketed material, rather than the parties' various forms of pagination found at the bottom of each page of briefing and at various locations in deposition transcripts and other discovery materials.

After a hearing on Philip Morris' motions,[3] the Court (Gertner, J.), certified two questions to the Massachusetts Supreme Judicial Court: 1) "[d]oes the plaintiffs' suit for medical monitoring, based on the subclinical effects of exposure to cigarette smoke and consequent increased risk of lung cancer, state a cognizable claim and/or permit a remedy under Massachusetts state law?;" and 2) "[i]f the plaintiffs have successfully stated a claim or claims, has the statute of limitations governing those claims expired?" D. 98. The Court then denied Philip Morris' motions without prejudice to their refiling once the Supreme Judicial Court opined on the certified questions. 2/27/2009 docket entry. On April 14, 2009, the case was stayed pending proceedings before the Supreme Judicial Court. D. 100.

The Supreme Judicial Court issued its opinion on October 19, 2009, answering "yes" to the first question and "no" to the second. Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 216 (2009) ("Donovan I"). As to liability, the Supreme Judicial Court specifically held that under Massachusetts tort law, a plaintiff seeking future damages for medical monitoring following exposure to hazardous substances must prove that "(1) [t]he defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint." Id. at 226. As to the statute of limitations,

---

[3] The plaintiffs' class certification motion was mentioned at this hearing, but was not the subject of formal argument. See generally Transcript of November 6, 2008 Hearing, D. 85.

the Supreme Judicial Court held that "the statute begins to run when (1) there is a physiological change resulting in a substantial increase in the risk of cancer, and (2) that increase, under the standard of care, triggers the need for available diagnostic testing that has been accepted in the medical community as an efficacious method of lung cancer screening or surveillance," and concluded that if the plaintiffs could prove to a factfinder that they had "no remedy until LDCT appeared," then "their claims are timely." Id. at 229. Additionally, the Supreme Judicial Court explicitly refused to weigh in on issues relating to class certification, noting that it considered the questions certified by this Court "in the context of a dispute between two individuals" and that its answers "address only the named plaintiffs and their individual claims" and that questions affecting class treatment were beyond the scope of the certified questions. Id. at 221.

On October 23, 2009, on the heels of the Supreme Judicial Court's ruling, this Court lifted the stay. On June 24, 2010, after supplemental briefing and a hearing, the Court granted in part and denied in part the plaintiffs' class certification motion. Donovan II, 268 F.R.D. at 30-31; D. 119. In regard to the plaintiffs' breach of implied warranty and 93A claims, the Court found that the plaintiffs' proposed class satisfied the numerosity, commonality, typicality and adequacy of representation requirements under Fed. R. Civ. P. 23(a), that the plaintiffs had alleged a group injury insofar as Philip Morris has acted on grounds generally applicable to the class and had alleged further that injunctive relief would be appropriate respecting the class as a whole sufficient to satisfy the requirements of Fed. R. Civ. P. 23(b)(2) and that class issues sufficiently predominate over individual issues and that a class action was a sufficiently superior method for adjudicating the plaintiffs' claims to satisfy the requirements of Fed. R. Civ. P. 23(b)(3). See Donovan II, 268 F.R.D. at 10-29; D. 122. Accordingly, the Court certified the plaintiffs' proposed class under both Rule

23(b)(2) and (b)(3) as to the breach of implied warranty and 93A claims. <u>Donovan II</u>, 268 F.R.D. at 30. The Court declined to certify the plaintiffs' negligence claim for class treatment. <u>Id.</u> at 29-30.

On July 8, 2010, Philip Morris sought interlocutory appellate review pursuant to Fed. R. Civ. P. 23(f). <u>Donovan v. Philip Morris USA, Inc.</u>, Case No. 10-8025 (1st Cir. case filed July 8, 2010). On September 1, 2010, after briefing by the parties, the First Circuit denied Philip Morris' petition for leave to file its interlocutory appeal. <u>Id.</u> (judgment entered Sept. 1, 2010). In its judgment, responding to Philip Morris' assertion that "this case presents novel and important issues and that interlocutory review would allow for more effective review of those issues," the First Circuit stated that, "[h]aving thoroughly reviewed the district court's certification decision and relevant portions of the record, we conclude that any novel issues presented would be susceptible to effective review as part of an appeal taken at the conclusion of the litigation, and we see no reason to delay the progress of this already complex litigation by interceding at this time." <u>Id.</u>

B.    <u>Post-Certification Procedural Background and Developments in Controlling Law</u>

On May 20, 2011, Judge Gertner notified the parties that the case would have to be transferred from her session for trial purposes and expressed her desire to resolve all pre-trial matters before the case was transferred. 5/20/2011 docket entry. Over the next six weeks, the parties filed a flurry of pretrial motions and related briefs.[4]

On May 25, 2011, in response to a motion filed by the plaintiffs on April 5, 2011 (predating the Court's May 20, 2011 docket entry), the Court amended the definition of the certified class to

---

[4] <u>See, e.g.</u>, D. 222, 223, 224, 226, 227, 229, 230, 231, 232, 233, 234, 235, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 263, 264, 265, 266, 267, 268, 270, 271, 272, 274, 275, 276, 277, 278, 279, 281, 282, 283, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, filed between May 26, 2011 and July 12, 2011.

require that class members "were residents of the Commonwealth as of any period between December 14, 2006, and May 2, 2011," so as to include individuals who would have been class members when the plaintiffs' complaint was filed but had subsequently moved out of state.  D. 221. Accordingly, the current definition of the certified class is:

> individuals who, as of May 2, 2011:  a) are fifty years of age or older, b) have cigarette smoking histories of twenty pack years or more using Marlboro cigarettes, c) currently smoke Marlboro cigarettes or quit smoking on or after December 14, 2006, d) are not diagnosed as suffering from lung cancer or under investigation by a physician for suspected lung cancer as of the date of any judgment being entered, or relief obtained, in this action, e) have smoked Marlboro cigarettes within the Commonwealth of Massachusetts, and f) were residents of the Commonwealth as of any period between December 14, 2006, and May 2, 2011.

D. 221.

On June 20, 2011, the Supreme Court issued its opinion in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), which vacated the certification under Fed. R. Civ. P. 23(b)(2) of a class of plaintiffs in a Title VII employment discrimination case on the grounds that their claims did not satisfy the commonality requirement under Rule 23(a)(2) and that the monetary back pay awards sought by the plaintiffs precluded certification under Rule 23(b)(2) (and that awards of that sort should instead be subject to the protections set forth in Rule 23(b)(3)).  Id. at 2550-52, 2557-59.

On July 14, 2011, Judge Gertner notified the parties that despite the best efforts of counsel and the Court, it would not be possible for this Court to resolve the pending pretrial motions before she retired and the case was transferred to another judge.  7/14/2011 docket entry.

On September 23, 2011, the case was reassigned from Judge Gertner to this session. 9/23/2011 docket entry.  On October 11, 2011, the Court issued an order requiring the parties to confer to discuss the sequence in which the various pending motions and the unresolved issue of class notice should be resolved and file a proposed joint schedule for all pretrial matters.  10/11/2011

docket entry.  The parties filed their joint statement on October 25, 2011, D. 309, and the Court held

a status and scheduling conference with counsel on December 8, 2011.  12/8/2011 docket entry.

      In the parties' October 25th joint statement, Philip Morris notified the Court of its intent to

file a motion to decertify the plaintiffs' class "in light of several intervening developments in the

relevant law and facts, including the U.S. Supreme Court's ruling in <u>Wal-Mart Stores, Inc. v.</u>

<u>Dukes</u>."  D. 309 at 5.  Philip Morris filed the instant decertification motion on October 31, 2011,

asserting that "several intervening developments in the relevant law and facts require reconsideration

of the Court's order certifying a class in this action."  D. 312.  In multiple rounds of briefing on its

motion, Philip Morris has argued that both <u>Dukes</u> and information that has come to light since the

Court's June 24, 2010 and May 25, 2011 certification orders justify decertifying the class.  Def.

Memo, D. 313 at 6-29; Def. Reply, D. 329 at 7-26.  Philip Morris also appears to contest the grounds

of the Court's original June 24, 2010 decision to certify the class.  <u>See</u> Def. Memo, D. 313 at 12 n.6;

<u>see generally</u> Def. Memo, D. 313 at 8-29; Def. Reply, D. 239 at 8-26.  The Court heard argument

on Philip Morris' motion on January 27, 2012 and took the matter under advisement.[5]

**III.**    **Discussion**

    A.    <u>Legal Standard</u>

      Because both Philip Morris and the plaintiffs have cited in their respective briefs cases

dealing with both motions to decertify and motions to reconsider, <u>see, e.g.,</u> Def. Memo, D. 313 at

6-7 (citing cases involving decertification and cases involving reconsideration); Pls. Memo, D. 315

at 11-12 (same), the Court briefly discusses the applicable standard.

---

    [5] The Court notes that it has also reviewed the post-hearing filings submitted by the
parties on February 14 and 21, 2012.  Def. Notice of Supplemental Authorities, D. 344;
Plaintiffs' Letter/Request, D. 345.

As Philip Morris acknowledges, decertification is governed by Fed. R. Civ. P. 23(c)(1)(C), which states that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). This rule authorizes "the court [to] decertify a class at anytime before final judgment." In re Sonus Networks, Inc. Sec. Litig., 229 F.R.D. 339, 348 (D. Mass. 2005). Decertification may be justified by post-certification developments "such as the discovery of new facts or changes in the parties or in the substantive or procedural law." O'Connor v. Boeing N. Am., Inc., 197 F.R.D. 404, 410 (C.D. Cal. 2000) (quoting Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 477 (D. Colo. 1998)); see, e.g., In Re Sonus Networks, 229 F.R.D. at 348 (decertifying class after change in parties); Connor B. v. Patrick, 2011 WL 5513233, at *2-*5 (D. Mass. Nov. 10, 2011) (reviewing and rejecting a decertification motion based on an alleged change in law); Payton v. Abbott Labs, 100 F.R.D. 336, 339-40 (D. Mass. 1983) (decertifying class after a change in applicable Massachusetts law); see also Westways World Travel, Inc. v. AMR Corp., 2005 WL 6523266, at *4-*6 (C.D. Cal. Feb. 24, 2005) (decertifying class based on new facts developed in post-certification discovery). A decision to decertify a previously certified class is not taken lightly, and, as other courts have noted, "should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a 'drastic' step." In re Vivendi Universal, S.A. Sec. Litig., 2009 WL 855799, at *3 (S.D.N.Y. Mar. 31, 2009) (quoting Gordon v. Hunt, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)). On a motion to decertify a previously certified class, "[d]oubts regarding the propriety of class certification should be resolved in favor of certification." Slaven v. BP Am., Inc., 190 F.R.D. 649, 651 (C.D. Cal. 2000) (citing 4 H. Newberg & A. Conte, Newberg on Class Actions § 7540 (3d ed.1992)).

As to reconsideration independent of any changed conditions of fact or law, the proper method for challenging an adverse class certification decision prior to judgment is to seek

interlocutory review pursuant to Fed. R. Civ. P. 23(f), which states that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered." Fed. R. Civ. P. 23(f). Reconsideration outside of this channel is disfavored, as it "would undermine the fourteen-day deadline to appeal a class certification order and would essentially give an unhappy litigant the power to seek reconsideration of an order at any time," and allowing litigants to file a reconsideration motion seeking decertification "at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless." Connor B., 2011 WL 5513233 at *1, *6. Accordingly, where, as here, a party has properly sought interlocutory appellate review pursuant to Rule 23(f) and that request has been denied by the First Circuit, subsequent reconsideration of the original certification by the district court should be exceedingly rare. See In re Mercedes-Benz Tele Aid Contract Litig., 267 F.R.D. 113, 135 (D.N.J. 2010) (noting that "[a]fter a thorough review of the case law in this and other circuits, the Court has been unable to find a single case in which a district court entertained a motion for reconsideration of an order certifying a class after a request for interlocutory review of that order pursuant to Rule 23(f) was denied"); see also 3 W. Rubenstein, A. Conte & H. Newberg, Newberg on Class Actions § 7:47 (4th ed. 2011) (observing that "[i]n the absence of materially changed or clarified circumstances, or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of rearguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling"). Accordingly, this Court shall treat Philip Morris' motion as it has been labeled: a motion for decertification. The Court, therefore, addresses Philip Morris' argument in the context

of the Rule 23(c)(1)(C) standard, in which decertification may be warranted in light of changes in the law or the discovery of new facts as Philip Morris argues is the case here.

      B.    <u>Analysis</u>

Philip Morris asserts three grounds for decertifying the class.  First, Philip Morris argues that, in light of <u>Dukes</u> and factual developments, the relief sought by the plaintiffs is monetary, not injunctive, and thus the class should be decertified under Fed. R. Civ. P. 23(b)(2).  Second, Philip Morris argues that, in light of <u>Dukes</u>, a combination of the Rules Enabling Act, 28 U.S.C. § 2072, and the commonality requirement set forth at Fed. R. Civ. P. 23(a)(2) preclude the plaintiffs from proving the causation and medical necessity elements of their claim on a class-wide basis rather than on an individual basis, and thus the plaintiffs' class should be decertified under both Fed. R .Civ. P. 23(b)(2) and (b)(3).  Third and finally, Philip Morris argues that, in light of <u>Dukes</u> and other developments in the law, the plaintiffs' class is not ascertainable and thus the class should be decertified under both Fed. R .Civ. P. 23(b)(2) and (b)(3).  Def. Memo, D. 313 at 6-8.

      1.    <u>Injunctive v. Monetary Relief</u>

A class may only be satisfied under Fed. R. Civ. P. 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) certification is not appropriate when money damages are the predominant relief that the plaintiffs seek."  <u>DeRosa v. Mass. Bay Commuter Rail Co.</u>, 694 F. Supp. 2d 87, 95 (D. Mass. 2010).  Philip Morris argues that a judgment for plaintiffs in this case "would simply require P[hilip] M[orris] to provide money from which to pay for monitoring," which it asserts is "relief that does not qualify for (b)(2) treatment."  Def. Memo, D. 313 at 14.

a.     Analysis in *Donovan II*

The Court addressed this issue in the original certification order.  Donovan II, 268 F.R.D. at 22-27.  First, the Court described the plaintiffs' proposed relief not as direct payment of the plaintiffs' medical expenses by Philip Morris but rather as "a structured program, monitored by and staffed with medical personnel, in which class members will receive regular medical screenings" and which would require "hir[ing] medical and administrative personnel, purchas[ing] equipment, and establish[ing] procedures for intake, informed consent, record keeping, and so on." Id. at 22. After an exhaustive review of analogous cases, the Court concluded that "[m]any courts have found medical monitoring relief structured as this one would be to be injunctive," id. at 22-23 (collecting cases), and that "even those courts that have found the monitoring remedy as proposed to be compensatory have reiterated that claims for medical monitoring alone may indeed be certified under 23(b)(2)." Id. at 23 (collecting cases).

Next, the Court in Donovan II reviewed Donovan I to determine whether the Supreme Judicial Court's opinion foreclosed the possibility that the claim stated here by the plaintiffs permitted equitable, injunctive relief rather than legal damages redressable only through a monetary award, Donovan II, 268 F.R.D. at 23-26, and concluded that "the SJC left open the possibility of purely equitable relief for medical monitoring product liability claims." Id. at 25.  Specifically,

> [t]he SJC opinion acknowledged that in some circumstances, legal damages will be perfectly appropriate, even preferable.  For example, if a medical test is easily accessible and can be purchased, damages will suffice.  This is most likely to be the case in an individual suit, which was precisely the way in which the SJC approached the certified questions. See Donovan [I] [at 900 n. 10].  An elaborate medical monitoring program may not make sense if only a few individuals seek relief.  But a class presents different issues—including lack of doctors and access to technology.
>
> Moreover, the fluid nature of medical monitoring remedies fits within broader tort law, which envisions a range of remedies. A cause of action in tort does not preclude an injunctive remedy . . . . While in most tort cases, plaintiffs seek compensation in

11

the form of money, in some circumstances, money cannot adequately compensate, and an injunction is therefore required to remedy the harm. . . . If the nuisance is continuing, an injunction is appropriate because damages will not fully remedy the harm.

Id. (internal citations and footnote omitted).

Next, the Court reviewed the evidence available to the Court as of June 24, 2010, Donovan II, 268 F.R.D. at 26, and concluded that the "[p]laintiffs' injuries are not adequately compensable by monetary damages." Id. Specifically, citing the record developed by the parties, the Court noted that "LDCT screening is not available through most health insurance programs," that "many class members may lack primary care physicians to prescribe LDCT screening," and that "[d]etermining the cost of the tests, particularly where potential class members are dispersed around Massachusetts and have access to different types of facilities, will be difficult." Id. (citations omitted).

Finally, the Court turned to the question of whether the injunctive relief was the predominant form of relief sought by the plaintiffs. Donovan II, 268 F.R.D. at 26-27. After reviewing the various tests courts have applied when determining the predominance of injunctive relief, id. at 27, the Court concluded that the plaintiffs here have established predominance regardless of which test was applied "because the relief they seek is wholly injunctive[;] [t]hey do not seek compensatory or punitive damages, and the remedy will be class-wide." Id. (emphasis in original).

      b.      Change in Law:  Wal-Mart Stores, Inc. v. Dukes

Philip Morris argues that the Supreme Court's recent opinion in Dukes compels the conclusion that the relief sought by the plaintiffs here is monetary, not injunctive, and thus not appropriate for certification under Fed. R. Civ. P. 23(b)(2). Philip Morris relies heavily on Dukes not only for its argument with regard to injunctive versus monetary relief, but also for its subsequent arguments regarding commonality and ascertainability, which are discussed more fully below.

In <u>Dukes</u>, the Supreme Court reviewed the certification of a class comprised of roughly one and a half million current and former female employees of Wal-Mart–described by the Court as "one of the most expansive class actions ever"–who alleged that their local supervisors' discretion over pay and promotion matters violated Title VII by discriminating against women. 131 S. Ct. at 2546. The <u>Dukes</u> plaintiffs did not allege that Wal-Mart had any express policy that could be construed as discriminatory; instead, they argued that Wal-Mart's "strong and uniform 'corporate culture'" permitted bias against women to "infect" the decisionmaking of thousands of individual store supervisors, who had wide discretion over pay and promotions, leading to a series of uncoordinated acts of discrimination and allegedly making every woman who worked for Wal-Mart "the victim of one common discriminatory practice." <u>Id.</u> at 2548.   The plaintiffs sought injunctive and declaratory relief as well as a monetary award of back pay specifically authorized by Title VII, 42 U.S.C. § 2000e-5(g)(1), which would vary in amount for different class members depending on their employment relationship with Wal-Mart and upon Wal-Mart's Title-VII-specific statutory defenses. <u>Id.</u> at 2549.

In a two-part decision, the Supreme Court held that the <u>Dukes</u> plaintiffs failed to show that "there are common questions of law or fact common to the class" as required by Fed. R. Civ. P. 23(a)(2), <u>Dukes</u>, 131 S. Ct. at 2554-57, and held unanimously both that monetary relief that is not incidental to injunctive or declaratory relief cannot be certified for class treatment under Fed. R. Civ. P. 23(b)(2) (thus clarifying the dispute mentioned in <u>Donovan II</u> regarding the proper test for determining whether injunctive relief is "predominant" over monetary relief in the (b)(2) context, <u>Donovan II</u>, 268 F.R.D. at 26-27) and that the back pay sought by the <u>Dukes</u> plaintiffs fell into the category of monetary relief that may not receive (b)(2) treatment. <u>Id.</u> at 2557-61.   It is the latter portion of <u>Dukes</u> that Philip Morris relies upon in support of its injunctive relief argument.

13

Specifically, Philip Morris points both to the Court's holding regarding predominance and to the <u>Dukes</u> plaintiffs' failed argument that their back pay claims were appropriate for (b)(2) treatment because a back pay award is technically an equitable remedy rather than a remedy at law.  The Supreme Court noted that the assertion that back pay is equitable relief "may be true, but it is irrelevant . . . . Rule [23(b)(2)] does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments.  As Title VII makes pellucidly clear, backpay is neither." <u>Dukes</u>, 131 S. Ct. at 2560.

This language in <u>Dukes</u> does not change the analysis of whether the plaintiffs' proposed remedy is fit for Rule 23(b)(2) certification contained in this Court's June 24, 2010 order.  Although that order does refer intermittently to the remedy sought by the plaintiffs as "equitable," <u>see Donovan II</u>, 268 F.R.D. at 17, 22, 24, 25, 27, 30, it is abundantly clear that the Court found that the proposed remedy belonged not only to the general category of equitable relief but also to the narrower category of injunctive relief.  <u>See id.</u> at 22-23 (section entitled "Is medical monitoring injunctive?"); <u>see also id.</u> at 22 ("[t]he medical monitoring remedy that plaintiffs seek here is nearly identical to the injunctive program described by <u>Day</u> [v. NLO, Inc., 144 F.R.D. 330,  335-36 (S.D. Ohio 1992), <u>vacated in part on other grounds</u>, <u>In re NLO, Inc.</u>, 5 F.3d 154, 160 (6th Cir. 1993)] and <u>Arch</u> [v. Am. Tobacco Co., Inc., 175 F.R.D. 469, 483-84 (E.D. Pa. 1997)]"); <u>id.</u> ("[m]any courts have found medical monitoring relief structured as this one would be to be injunctive"); <u>id.</u> at 23 ("[i]n sum, the plaintiffs' proposed remedy is injunctive in nature and may be pursued under 23(b)(2)").  Similarly, the discussion in <u>Dukes</u> shedding light on the standards to be applied in Rule 23(b)(2) predominance analysis does not change the outcome of the certification analysis in the Court's June 24, 2010 order, which explicitly states that no matter what standard is applied, "the

plaintiffs' class is properly certified under (b)(2) because the relief they seek is <u>wholly</u> injunctive."
<u>Donovan II</u>, 268 F.R.D. at 27 (emphasis in original).

At base, Philip Morris relies on <u>Dukes</u> less as a post-certification change in controlling law
that makes any material difference in the analysis in this case and more as the basis for resurrecting
an argument that was argued and considered by the Court in <u>Donovan II</u>: that "[t]he relief sought
by plaintiffs - even if it is 'equitable' in nature - is clearly not 'injunctive' because there is no such
thing as "an injunction to pay money.'" Def. Memo, D. 313 at 13-14 (quoting <u>U.S. Indus., Inc. v.
Anderson</u>, 529 F.2d 1227, 1229 (10th Cir. 1978)). The argument raised here in support of the
decertification motion is an echo of the argument made in opposition to the plaintiffs' certification
motion, <u>see, e.g.</u>, Def. Memo in Opp. to Class Certification, D. 72 at 42 n.51 (citing cases for the
proposition that a "[p]laintiff cannot transform a claim for damages into an equitable action by
asking for an injunction that orders the payment of money") and is one that the Court has already
rejected. <u>Donovan II</u>, 268 F.R.D. at 27 (noting that "Philip Morris argues that the medical
monitoring claim is a 'thinly-disguised request for money damages,' [D. 72] at 29[], and emphasizes
that a plaintiff cannot convert a legal action into an equitable one by asking for an injunction
ordering the payment of money. The plaintiffs, however, are not asking for an injunction that orders
the payment of money. They are seeking a specific, equitable remedy. Simply because an
injunction requires the defendant to pay money does not convert it into a monetary action") (internal
citations omitted). For the reasons stated above, <u>Dukes</u> does not constitute a change in the law
warranting decertification.

i.    <u>Post-*Dukes* cases</u>

Although Philip Morris cites to a number of post-<u>Dukes</u> cases in support of its argument for
decertification on the grounds that the relief sought is not injunctive, none of them compel the result

it seeks.  Philip Morris offers one recent case, <u>Gates v. Rohm & Haas Co.</u>, 655 F.3d 255 (3d Cir.

2011), which involved a class-based medical monitoring claim arising out of allegations that a

company dumped toxic wastewater that seeped into an aquifer and evaporated, polluting the air with

the toxic carcinogen vinyl chloride, and which Philip Morris asserts stands for the proposition that

"a judgment [that] would simply require P[hilip] M[orris] to provide money from which to pay for

monitoring [constitutes] relief that does not qualify for (b)(2) treatment in the wake of <u>Dukes</u>."  Def.

Memo, D. 313 at 14.  But <u>Gates</u> does not support that proposition; indeed, it expressly stopped short

of weighing in on the issue.  <u>Gates</u>, 655 F.3d at 263 ("[i]n light of the Supreme Court's recent

decision in <u>Wal-Mart Stores, Inc. v. Dukes</u>, we question whether the kind of medical monitoring

sought here can be certified under Rule 23(b)(2) but we do not reach the issue. . . . If the plaintiffs

prevail, class members' regimes of medical screenings and the corresponding cost will vary

individual by individual.  But we need not determine whether the monetary aspects of plaintiffs'

medical monitoring claims are incidental to the grant of injunctive or declaratory relief.  [Here,] a

single injunction or declaratory judgment cannot provide relief to each member of the class proposed

here due to individual issues unrelated to the monetary nature of the claim") (internal quotations and

citations omitted).

Philip Morris also briefly discusses <u>Huber v. Taylor</u>, 2011 WL 4553154 (W.D. Pa. 2011),

which it offers as an example of a court that "applied fresh scrutiny to arguments that claims for

'equitable' remedies are fit for certification under (b)(2), and . . . rejected such claims where the

primary object of the suit is payment of money by the defendant."  Def. Reply, D. 329 at 9-10.

Although <u>Huber</u> did cite <u>Dukes</u> in support of that proposition, <u>Huber</u>, 2011 WL 4553154, at *1,

Philip Morris' reliance on <u>Huber</u> is misplaced.  <u>Huber</u> was not a medical monitoring case.  Instead,

the defendants in <u>Huber</u> were lawyers who had represented a group of asbestos-related-injury

16

plaintiffs in a consolidated, class-action-like proceeding; the Huber plaintiffs were a subset of those plaintiffs who sued the lawyers alleging misuse of class funds and claiming disgorgement of fees and punitive damages for the lawyers' alleged past misconduct.  Huber, 2011 WL 4553154, at *1-*2.  Indeed, the Huber plaintiffs filed an amended complaint that "purposefully abandon[ed] claims for injunctive relief" in lieu of monetary relief in the form of fees and damages. Id. at *2.  When the Huber plaintiffs sought to be treated as a Rule 23(b)(2) class, the court rightly pointed out that Rule 23(b)(2) treatment was unavailable to defendants seeking only monetary damages, id., a point that was clear before Dukes.  See Huber, 2011 WL 4553154 at *2 (citing Jefferson v. Ingersoll Int'l, Inc., 195 F.3d 894, 897 (7th Cir. 1999)).  Indeed, with regard to Rule 23(b)(2) certification, Huber is the exact converse of the instant case:  here, as the Court has noted multiple times, "the relief [the plaintiffs] seek is wholly injunctive.  They do not seek compensatory or punitive damages." Donovan II, 268 F.R.D. at 27 (emphasis in original).

Similarly, Philip Morris points to Ellis v. Costco Wholesale Corp., 657 F.3d 970 (9th Cir. 2011), which it describes as a case "vacating certification of [a] (b)(2) class because Dukes bars (b)(2) claims for individualized relief."  Def. Memo, D. 313 at 18.  The plaintiffs in Ellis, who (like the plaintiffs in Dukes) alleged gender discrimination in violation of Title VII, sought not only injunctive relief but also punitive monetary damages and individual monetary awards of back pay and compensatory damages and their request for certification under Rule 23(b)(2) was rejected because Dukes explicitly precluded (b)(2) certification for claims for individualized monetary relief such as back pay.  Ellis, 657 F.3d at 977, 987-88.[6]  Ellis does not suggest that plaintiffs seeking

---

[6] The district court presiding over the Ellis case certified the proposed class under Rule 23(b)(2), in an order issued prior to Dukes, on the ground that the injunctive relief sought by the plaintiffs predominated over the other requested forms of relief.  Ellis, 657 F.3d at 978.  The Ninth Circuit, reviewing the case in the wake of Dukes, held that the plaintiffs' back pay claims

wholly injunctive relief and disclaiming any monetary damages, individualized or otherwise, may

not pursue that relief through a Rule 23(b)(2) class action.

Finally, a month after the Court's January 27, 2012 hearing on Philip Morris' decertification

motion, Philip Morris notified the court of the Seventh Circuit's recent opinion in Jamie S. v.

Milwaukee Pub. Schs., 668 F.3d 481 (7th Cir. 2012).  In Jamie S., plaintiffs sought structural reform

of special education in the Milwaukee Public School district ("MPS") as a remedy for alleged

violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq.,

under which "local districts must identify children with disabilities, determine whether these

children require special-education services, and develop individualized education programs ("IEPs")

tailored to each student's specific needs."  Jamie S., 668 F.3d at 485.  "Each step in th[is] process

is highly individualized because every child is unique."  Id.  Pursuant to Fed. R. Civ. P. 23(b)(2),

the district court certified a class of "students eligible to receive special education from MPS who

are, have been or will be denied or delayed entry into or participation in the IEP process."  Id.

(internal quotations omitted).  Following certification and several years of discovery, the court held

a bench trial and found the defendants liable.  Id. at 488.  After the finding of liability, the court

sought briefing from the parties as to "how putative members of the class were to be evaluated for

inclusion in the class; how individual liability and compensatory-education determinations should

be made; which party should prevail when the evidence is inconclusive; how disputes between the

parties should be resolved; and who should pay for the dispute-resolution process."  Id. at 489.  After

receiving the parties' briefs, the Court "ordered the creation of a 'hybrid' IEP team, closely

—————————————————

were individual monetary claims that could be certified only under Rule 23(b)(3), not Rule
23(b)(2), and remanded to the district court to determine in the first instance whether the
plaintiffs' non-individual monetary claim for punitive damages was susceptible to Rule 23(b)(2)
certification in light of Dukes.  Ellis, 657 F.3d at 987-88.

resembling the IEP team required by the IDEA but including a court-appointed independent monitor to oversee its operation." Id. The court-monitored hybrid IEP team had a great deal of authority and wide discretion:

> The hybrid IEP team was charged with . . . determin[ing] how to proceed in each individual [class member's] case. In some cases it might be obvious that the child is not disabled, and no further evaluation would be required. In others a professional evaluation would be required to determine whether the child has a disability. In others a full IEP meeting would be needed to determine whether the child requires special-education services in order to receive a free appropriate public education. And finally, in some cases the child might be entitled to compensatory education - a remedy available under the IDEA - to compensate for a past denial of a free appropriate public education. The hybrid IEP team was given the authority to grant compensatory-education awards, subject to the court's oversight. The estimated cost to MPS to implement this remedy: between $11.5 and $40 million, depending on how many parents responded and the extent of the compensatory education awarded to qualifying children.

Id. On appeal, the Seventh Circuit vacated the district court's certification decision, on the ground that the relief ordered by the court was purely injunctive but was not nearly "final," as required by Fed. R. Civ. P. 23(b)(2). Id. at 498-50. Instead, the "intricate remedial scheme ordered by the district court . . . requires thousands of individual determinations of class membership, liability, and appropriate remedies" and "merely establishes a system for eventually providing individualized relief. It does not, on its own, provide 'final' relief to any class member." Id. at 499.

While the Jamie S. case may be more instructive than the various other cases invoked by Philip Morris as post-Dukes authority discussing Fed. R. Civ. P. 23(b)(2), Jamie S. is nonetheless distinguishable and does not implicate the Court's earlier conclusion that the remedy proposed here by the plaintiffs is final injunctive relief for the purposes of Rule 23(b)(2). The LDCT screening program urged by the plaintiffs will have no discretionary power to determine liability with regard to an individual class member; the liability determination will be made in a binding group-based determination by the factfinder prior to the award of any relief. Donovan II, 268 F.R.D. at 12-22.

19

The contours of class membership have been clearly and objectively delineated by the Court such that the administration of the LDCT monitoring program will involve applying the orders of this Court regarding class membership and relief, rather than making discretionary determinations about these matters.  Id. at 9.  Similarly, the remedy here is monitoring; the class in the instant case does not seek post-monitoring relief akin to the post-evaluation "compensatory education" relief sought by the class in Jamie S.  Jamie S., 668 F.3d at 489.  Although Jamie S. may provide an example of unique injunctive relief that cannot survive post-Dukes Rule 23(b)(2) review, it does not cast doubt on this Court's June 24, 2010 determination that the programmatic injunctive relief sought by the plaintiffs satisfies the requirements of Rule 23(b)(2).

Accordingly, there has been no change in law under Dukes and its progeny as to the issue of whether the relief sought by the plaintiffs is sufficiently injunctive to merit decertification of the class in this case under Fed. R. Civ. P. 23(b)(2).

        c.        Post-Certification Discovery: New Information about LDCT Scans

As the Court has noted previously, "[t]o obtain injunctive relief, a plaintiff generally must satisfy a four-part test: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  Donovan II, 268 F.R.D. at 26 (quoting CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008)).  In its June 24, 2010 certification order, the Court found that the plaintiffs here had satisfied all four parts of this test.  Id. at 26.  Philip Morris argues that recently discovered facts have disproved the Court's analysis with regard to the second part of the test and have shown that "[t]he class members here have an adequate legal remedy available to them:  monetary damages that they can use to purchase

LDCT scans on their own."  Def. Memo, D. 313 at 15.  Based on the recent discovery material provided by the parties, the Court reaches the opposite conclusion:  the inadequacy of providing the plaintiffs with money damages, as opposed to programmatic injunctive relief, appears even more clear now than it was when the Court issued its June 24, 2010 certification order.

Before turning to the discovery Philip Morris offers in support of its argument, the Court must first address the issue of the proper standard for determining whether a remedy at law–here, monetary damages–is sufficiently "adequate" to preclude injunctive relief.  "What constitutes an adequate legal remedy depends on the facts of each case."  11A Charles Alan Wright et al., Federal Practice and Procedure § 2944 (2d ed. 2011).  "An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as a remedy in equity by injunction." Id. (quoting Local Union 499 of Int'l Bhd. of Elec. Workers, AFL-CIO v. Iowa Power & Light Co., 224 F. Supp. 731, 738 (S.D. Iowa 1964)); see also Am. Life. Ins. Co. v. Stewart, 300 U.S. 203, 214 (1937) ("[a] remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient"); City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 12 (1898) ("the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity"); Interstate Cigar Co. v. United States, 928 F.2d 221, 223 (7th Cir. 1991) ("an available remedy at law must be plain, clear and certain, prompt or speedy, sufficient, full and complete, practical, efficient to the attainment of the ends of justice, and final") (quoting 27 Am. Jur. 2d Equity § 94 (1966)); United States v. Bluitt, 815 F. Supp. 1314, 1317 (N.D. Cal. 1992) (same) (quoting Interstate Cigar Co., 928 F.2d at 223); Jones v. Fenton Ford, Inc., 427 F. Supp. 1328, 1337 (D. Conn. 1977) ("[i]t is well settled, however, in the federal system at least, that equity jurisdiction is not barred unless the available legal remedy is as complete, as

21

practical and as efficient to the ends of justice as that afforded by equity") (internal quotations and citations omitted) (collecting cases).  The standard applied under Massachusetts state law is essentially identical.  See McGrath v. C.T. Sherer Co., 291 Mass. 35, 41-42 (1935) ("[a]n adequate remedy at law which will deprive a court of equity of jurisdiction is a remedy as certain, complete, prompt and efficient to attain the ends of justice as the remedy in equity").  A legal remedy may be deemed inadequate if any of a number of factors is present, including "if plaintiff shows that a monetary award would be speculative because the amount of damage would be difficult or impossible to measure, or if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time he was injured."  11A Charles Alan Wright et al., Federal Practice and Procedure § 2944 (2d ed. 2011) (internal citations omitted).

The Court's June 24, 2010 certification order found monetary damages inadequate in part because "[d]etermining the cost of the tests, particularly where potential class members are dispersed around Massachusetts and have access to different types of facilities, will be difficult."  Donovan II, 268 F.R.D. at 26.  Philip Morris argues that this contention has been disproved by an expert report, issued on March 2, 2011, by the plaintiffs' experts Arnold Epstein, M.D., M.A. and Gerry Oster, Ph.D., discussing the estimated cost of an LDCT lung cancer screening program for twenty-pack-year smokers of Marlboro cigarettes in Massachusetts, D. 313-2, and which, according to Philip Morris, opines that the remedy sought by the plaintiffs "can be monetized with pinpoint precision."  Def. Memo, D. 313 at 14.  The Court disagrees.

The purpose of the Epstein/Oster report was to estimate both the number of participants eligible for and the total cost of the LDCT screening program that the plaintiffs seek as relief in this action; the results of the study led to an estimate of a program that would run for 28 years, include

36,671 eligible participants and have a net present value total cost of $187,461,720 (including both

central administration costs and marginal costs for each participant and each scan performed, but

excluding the cost of recruiting eligible individuals into the program).  D. 313-2 at 5, 31.  This

number is the basis of Philip Morris' claim regarding "pinpoint precision."  But nothing in that

report suggests that a cash award of $187,461,720 shared among the class members would provide

relief that would be as certain or as complete as the LDCT program the plaintiffs actually seek.

First, Philip Morris overestimates the importance of the fact that the Epstein/Oster report includes

a specific dollar estimate for the total cost of the program and underestimates the importance of the

fact that the specific dollar amount identified in the report is only an estimate.  The report is candid

about the fact that the estimated LDCT program cost is built on a long series of assumptions,[7] and

to the extent that those assumptions deviate from the actual inputs into or results from injunctive

relief ordered by the Court–if, for example, advances in oncology in the next few decades increase

the percentage of individuals who survive cancer after being diagnosed via LDCT screening above

the 80% estimated in the study, id. at 17, or if advances in health care coverage and technology

reduce overall mortality rates and extend general lifespan in Massachusetts beyond the levels

estimated in the study (which are drawn from nationwide statistics for the year 2007), id. at 23,

either of which would increase re-enrollment in the program over the levels estimated in the study

and thus would drive up costs, id. at 27-30–the actual cost of the program will deviate from the

---

[7] The estimates and assumptions underlying the Epstein/Oster report included but were
not limited to assumptions about the size of the class; how long members would remain in the
class; the likely results of LDCT scans for class members; mortality rates; the costs of a Court-
ordered program compared with market rates and federal Medicare rates; and the overall costs of
the program.  Epstein/Oster Report, D. 313-2 at 7-29.  Additionally, the report assumed that
there would be one-time start-up costs relating to setting up the central administrative apparatus,
negotiating with medical facilities and providers, developing standard protocols of care "and so
forth," and the report "arbitrarily assumed that these costs would total $1 million."  Id. at 26.

estimated cost.  At least some evidence recently submitted to the Court suggests that such deviation might not be unexpected.  See Philipson Report (excerpts submitted by the plaintiffs), D. 316-23 (May 19, 2011 report of Philip Morris' expert Tomas Philipson, Ph.D, disputing assumptions underlying the Epstein/Oster report's estimated class size).  Indeed, perhaps the clearest lesson to be taken from a full review of Dr. Epstein and Dr. Oster's comprehensive report (as well as the Philipson report) is that estimating the cost of the plaintiffs' proposed program is exceedingly difficult.  Accordingly, the Epstein/Oster report reinforces, rather than undermines, the Court's earlier conclusion that "the LDCT screening program is . . . difficult to monetize." Donovan II, 268 F.R.D. at 26.

In certifying the plaintiffs' class, the Court accepted, at least conditionally, the plaintiffs' assertion that "class members would not be able to purchase LDCT tests if they were simply awarded damages," in part because "LDCT scans are not generally available throughout Massachusetts." Donovan II, 268 F.R.D. at 26.  Philip Morris argues that post-certification discovery has disproved this assertion.  Specifically, Philip Morris points to the June 9, 2011 deposition of the plaintiffs' expert Dr. Christine Oliver, in which she testified about, among other things, the possibility that LDCT scans may be currently available for purchase at four sites in the Boston area (at two hospitals in Boston, one in Newton, and at a medical center in the North Shore area), and the probability that LDCT scanning will become available in more hospitals.  Oliver Deposition (excerpts provided by Philip Morris), D. 313-3 at 4-8.  Philip Morris also points to the October 31, 2011 affidavit of Philip Morris' expert Dr. Robert M. Schick, in which he opined that "major hospitals, medical centers and imaging facilities have begun to offer LDCT lung cancer screening services in Massachusetts," specifically identifying three hospitals in Boston, one medical clinic with three campuses in the Boston area (in Somerville, Burlington and the North Shore) and

one hospital in Plymouth that "are today offering LDCT scans for lung cancer screening for high risk individuals seeking those services." D. 313-4 at ¶¶ 8, 32.[8]  They also note that in depositions taken after the Court's June 24, 2010 certification order, the named plaintiffs, Donovan and Cawley, each stated that with Dr. Oliver's assistance they had received an individual LDCT scan.  Donovan Deposition (excerpts provided by Philip Morris), D. 313-5 at 6-7; Cawley Deposition (excerpts provided by Philip Morris), D. 313-6 at 3-4.  These newly-discovered facts, which are uncontested by the plaintiffs, do not undermine the Court's earlier conclusion that LDCT screening is not yet generally available in Massachusetts.  That individuals in the greater Boston area, or those with the assistance of an expert like Dr. Oliver, are able to acquire individual LDCT scans establishes little about the ability of individuals without such assistance (precisely the type of expertise that the plaintiffs' proposed programmatic relief is designed to make available to the class) or those located elsewhere in Massachusetts, see Donovan II, 268 F.R.D. at 26 (noting that "potential class members are dispersed around Massachusetts"), to obtain such scans and have them interpreted effectively.[9]

---

[8] Dr. Schick's affidavit also states that "[i]t is common among even the smaller and more rural community hospitals to maintain 'clinical affiliation' with larger urban medical centers or medical schools. . . . Hence, imaging facilities and physicians in smaller, rural hospitals have access to the highest level of care through their affiliations with the major urban medical facilities in Massachusetts." D. 313-4 at ¶ 33.  Dr. Schick also notes, as a theoretical matter, that "[t]he lung cancer screening requested by plaintiffs can be performed in the normal practice of radiology departments," id. at ¶¶ 12, but his affidavit does not suggest that a person who desires an LDCT scan could, at present, purchase and receive one at any facility in Massachusetts other than the five mentioned by name in the affidavit. Id. at ¶ 32.

[9] Similarly, Philip Morris' reliance on Dr. Schick's statement, uncontested by the plaintiffs, that "today nearly all Massachusetts residents are insured" as "only 1.9% of Massachusetts residents remain uninsured as of summer of 2010," D. 313-4 at ¶ 34, does not undermine the Court's conclusion in its June 24, 2010 certification order that whether individuals have health insurance or not, "LDCT screening is not available through most health insurance programs," Donovan II, 268 F.R.D. at 26.  See Oliver Report, D. 316-4, at 8 (noting that "[h]ealth insurance generally does not pay for screening LDCT") (report issued prior to certification).  On the other hand, Philip Morris does correctly point out that one of the

In any event, for the purposes of an adequacy of remedy analysis, the narrow questions of whether the cost of the plaintiffs' proposed relief can be estimated with precision or whether LDCT tests are readily available for purchase are less important than the larger question of whether any amount of money damages could provide a remedy to the plaintiffs that is as complete, certain and efficient as the programmatic injunctive relief they seek. Put another way, even if it were possible both to anticipate accurately the precise cost of the plaintiffs' proposed programmatic remedy and for members of the class to divide up a damages award equal to that precise cost and use the proceeds to purchase individual LDCT tests, the plaintiffs' proposed remedy would not be precluded unless purchasing individual LDCT tests provided them relief that was as certain, complete and efficient as the proposed programmatic remedy.[10] The discovery materials provided to the Court by

---

certification order's assertions, that "many class members may lack primary care physicians to prescribe LDCT screening," Donovan II, 268 F.R.D. at 26, may have been eroded by factual development. According to Dr. Schick's subsequent report, "92 percent of Massachusetts residents reported that they have a person they think of as their primary health provider." Schick Affidavit, D. 313-4 at ¶ 34. However, as the plaintiffs note, this figure may "include numerous individuals who consider their gynecologist, allergist, chiropractor, or psychologist as fulfilling that role, since that is the principal health care provider they see," Pls. Reply Regarding Motion to Strike Philip Morris' Thirty-Sixth Affirmative Defense (Existence of a Remedy at Law), D. 322 at 5. In any event, even read in the light most favorable to Philip Morris, Dr. Schick's figure suggests that at least 8% of Massachusetts residents would not know where to turn to receive a referral for LDCT testing.

[10] Philip Morris' focus on facts showing that it may be possible under some circumstances for some individuals in Massachusetts to simply purchase LDCT scans without the assistance of a programmatic remedy, and its relative lack of emphasis on whether a damages remedy would provide relief as certain, complete and efficient as such a programmatic remedy, may stem from reliance on a phrase included in the Court's June 24, 2010 certification order taken out of its proper context. Philip Morris, at one point, cites to the Court's statement that "if a medical test is easily accessible and can be purchased, damages will suffice," Def. Memo Regarding Motion to Strike Philip Morris USA Inc.'s Thirty-Sixth Affirmative Defense (Existence of an Adequate Remedy at Law), D. 290 at 3 (quoting Donovan II, 268 F.R.D. at 25), but this statement was the Court summarizing the Supreme Judicial Court opinion, Donovan I, and not setting forth the standard for determining whether damages are an adequate remedy in the face of the plaintiffs' instant request for injunctive relief. Indeed, as a fuller reading of the

the parties make clear that, even under these hypothetical circumstances, damages would be inadequate compared to programmatic injunctive relief.

For example, in her June 9, 2011 deposition, Dr. Oliver opined that merely having LDCT scans available for purchase (as is now the case at some Boston-area hospitals) is inferior to a fully developed LDCT screening program of the kind proposed by the plaintiffs, which according to Dr. Oliver would include not only individual scans but also infrastructure and dedicated staff for enrollment, smoking cessation efforts, coordination with primary care physicians, and tracking and follow-up procedures.  Oliver Deposition (excerpts provided by the plaintiffs), D. 316-8 at 9-12. Similarly, in his June 8, 2011 deposition, the plaintiffs' expert Dr. Harvey Pass discussed the importance of aggressively following up with individuals depending on the results of their LDCT scans or their attendance at scheduled follow-up scans, which requires programmatic rather than one-off fee-for-service arrangements.  Pass Deposition (excerpts provided by the plaintiffs), D. 316-9 at 3-9; <u>see also</u> Markowitz Deposition (excerpts provided by the plaintiffs), D. 316-15 at 3-4 (the plaintiff's expert Dr. Stephen Markowitz, deposed on June 7, 2011, discussing the importance of systematic patient tracking and follow-up after LDCT scans).  Indeed, Philip Morris' expert, Dr. Schick, acknowledged in a January 28, 2011 deposition in a different tobacco medical monitoring

_____

June 24, 2010 order makes clear, the Court took pains to state that while an "accessible and purchasable" standard might be useful in an individual tort claim brought under the <u>Donovan I</u> standard, it is not appropriate to import that standard into class actions.  <u>See</u> <u>Donovan II</u>, 268 F.R.D. at 25 ("The SJC opinion acknowledged that in some circumstances, legal damages will be perfectly appropriate, even preferable.  For example, if a medical test is easily accessible and can be purchased, damages will suffice.  This is most likely to be the case in an individual suit, which was precisely the way in which the SJC approached the certified questions.  <u>See</u> <u>Donovan</u> <u>II</u>, [455 Mass. at 223 n.10].  An elaborate medical monitoring program may not make sense if only a few individuals seek relief.  But a class presents different issues").  Nothing in <u>Donovan II</u> should be read to suggest that the Court, in explaining the Supreme Judicial Court's approach to individual tort claims, set forth a novel standard for the adequacy of a remedy at law for class action purposes.

case, <u>Xavier v. Philip Morris USA Inc.</u>, No. C. 10-02067-WHA (N.D. Cal.) (case filed May 14, 2010), that a screening program "absolutely" has advantages over individual LDCT screens, at least in terms of cost effectiveness and the efficient use of resources, and that a program might help develop practice and procedures regarding quality control in interpreting LDCT screens to the extent such controls are currently underdeveloped.  Schick Deposition (excerpts provided by the plaintiffs), D. 316-14, at 14-15.

These factual developments are consistent with the substantial amount of pre-certification factual development suggesting that the plaintiffs' proposed programmatic injunctive relief would provide more complete and more efficient relief than could be provided by money damages allowing individual class members to purchase individual LDCT scans.  Relevant pre-certification discovery included evidence documenting the importance of administrative oversight, not to make discretionary decisions about class membership or judicial relief as in <u>Jamie S.</u>, but to ensure initial outreach and continued participation and to organize communication between clinicians, radiologists and patients once class members receive LDCT scans, <u>see, e.g.</u>, Miller Report, D. 316-2 at ¶ 50 (November 13, 2007 report of the plaintiffs' expert Dr. Albert Miller); Miller Deposition (excerpts submitted by the plaintiffs), D. 316-6 at 5-14 (deposition taken November 30, 2006 in a different medical monitoring case, <u>Caronia v. Philip Morris USA Inc.</u>, No. 06-CV-0224 (E.D.N.Y.) (case filed January 19, 2006)); Markowitz Report, D. 316-3 at 4-5 (dated November 15, 2007); Markowitz Deposition (excerpts submitted by the plaintiffs), D. 316-5 at 3-14 (deposition taken December 15, 2006 in <u>Caronia</u>); Oliver Report, D. 316-4 at 4-10 (dated November 28, 2007); McCunney Deposition (excerpts submitted by the plaintiffs) D. 316-12 at 4-9 (deposition of Dr. Robert McCunney, taken on June 12, 2008), to accelerate development and refinement of proper algorithms for distinguishing suspicious, indeterminate and non-suspicious scan results from one another, <u>see,</u>

e.g., Markowitz Report, D. 316-3 at 4-5 (dated November 15, 2007); Markowitz Deposition (excerpts submitted by the plaintiffs), D. 316-5 at 3-14 (deposition taken December 15, 2006 in Caronia); Oliver Report, D. 316-4 at 8-9 (dated November 28, 2007); Oliver Deposition (excerpts provided by the plaintiffs), D. 316-10 at 2-7, 10-15 (deposition taken March 4, 2008); Miller Deposition (excerpts submitted by the plaintiffs), D. 316-6 at 5-14 (deposition taken November 30, 2006 in Caronia); McCunney Deposition (excerpts submitted by the plaintiffs), D. 316-12 at 4-9 (deposition taken on June 12, 2008), and to ensure quality control.  See, e.g., Goodman Deposition (excerpts provided by the plaintiffs), D. 316-13 at 4 (deposition of Dr. Philip Goodman, taken on January 30, 2007 in Caronia), Markowitz Report, D. 316-3 at 5 (dated November 15, 2007).

Further, as the Court noted in its June 24, 2010 certification order, given the difficulty in precisely estimating the cost of relief to the plaintiffs, any money damages award would run the risk of overcompensating the plaintiffs, and the surest way for the Court to avoid any such inefficiency is to fashion relief through an injunction rather than a money damages award.  Donovan II, 268 F.R.D. at 25 ("[l]egal damages, while intended to compensate the plaintiff for some harm, may be used for anything.  Courts may not put restrictions on monetary awards once paid.  Money damages are meant to stand in and compensate in whatever way the plaintiff chooses.  Equity, on the other hand, is specific. . . . Medical monitoring here is specific.  Funds not used for this purpose are returned to the defendant"); id. ("'the lump sum usually awarded for future medical expenses, may, in cases such as this, be ordered paid into an appropriate account and drawn down as the expenses are actually incurred.  If they are not used, the award, or balance thereof, may be returned to the defendant who was obligated to make such payment.  A plaintiff's reasonable attorney's fees and costs may be paid out of such award'") (quoting Donovan I, 455 Mass. at 226 n.12) (emphasis added by Donovan II).

By way of comparison, the parties have not alerted the Court to any facts or expert opinion, discovered either before or after the Court's June 24, 2010 certification order, that stand for the proposition that a simple money damages award could fashion relief that is as certain, complete and efficient as the injunctive programmatic remedy sought by the plaintiffs.

Accordingly, the recently discovered that Philip Morris relies upon regarding whether money damages would provide a sufficiently adequate alternative to the relief sought by the plaintiffs under Fed. R. Civ. P. 23(b)(2) does not justify decertifying the class in this case.

2.   <u>Commonality, Group Injury and Remedy, and Predominance</u>

No class action, whether brought pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) or otherwise, may be certified unless "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Additionally, prior to certifying a class under Rule 23(b)(3), a court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Although there is no similar predominance requirement in the text of Rule 23(b)(2), certification under that subsection does require that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), or, put another way, requires an affirmative answer to the question, "was there group injury that may be proven on a class-wide basis?," <u>Donovan II</u>, 268 F.R.D. at 12, and requires further that "the remedy sought must be group." <u>Id.</u> at 27. Philip Morris argues that questions of medical necessity and causation that are central to this case can be proved only on an individual rather than common group basis, that the remedy sought in this case is individual rather than group, and that any common questions that do exist in this case do not predominate over these allegedly individual questions. Accordingly, Philip Morris contends that the plaintiffs' class should be decertified under

30

both Rule 23(b)(2) and Rule 23(b)(3).  See, e.g., Def. Memo, D. 313 at 17-26; Def. Reply, D. 329 at 15-21; see also Def. Notice of Supplemental Authority, D. 344 at 1-5.  Further, Philip Morris argues that to allow certification to stand under Rule 23(b)(2) or Rule 23(b)(3) is to deny Philip Morris due process by effectively lowering the plaintiffs' burden of proof, Def. Memo, D. 313 at 27, 29, and violating the Rules Enabling Act's prohibition against "employing Rule 23 in a way that would 'abridge, enlarge or modify any substantive right.'"  Def. Memo, D. 313 at 27-29 (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)).

### a.  Analysis in _Donovan II_

The original certification order in Donovan II addressed each of these issues.  Donovan II, 268 F.R.D. at 10, 12-17, 28-29.  The Court shall begin its analysis by examining each relevant section of Donovan II in turn.

### i.  Rule 23(a)(2) - Commonality

First, as to the commonality requirement set forth in Fed. R. Civ. P. 23(a)(2), the Court noted that "[c]ommonality is a 'low hurdle,'" Donovan II, 268 F.R.D. at 10 (quoting S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 87 (D. Mass. 2007)), because "a single factual issue can suffice."  Id. (citing Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 25 (D. Mass. 2003)).  Applying that standard, the Court identified both a common issue of fact in that the "case involves one manufacturer of one brand of cigarettes" and "[c]ommon questions of law includ[ing] proximate causation and breach of warranty deriving from that one brand," and concluded that the plaintiffs "have met the commonality requirement."  Id.

### ii.  Rule 23(b)(2) - Group Injury and Group Remedy

Turning to the certification requirements set forth in Fed. R. Civ. P. 23(b)(2), the Court listed each of the seven elements of the medical monitoring cause of action as set out by the Supreme

Judicial Court in <u>Donovan I</u>–that "(1) the defendant's negligence (2) caused (3) the plaintiff[s] to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint," <u>Donovan I</u>, 455 Mass. at 226–and determined that the presence or absence of these seven elements could be established on a class-wide basis, making the plaintiffs' class fit for certification under Rule 23(b)(2).  <u>Donovan II</u>, 268 F.R.D. at 12-17.  The Court also determined that the remedy sought by the plaintiffs was a group remedy rather than an individual remedy.  <u>Id.</u> at 27.  Because Philip Morris currently disputes <u>Donovan II</u>'s conclusions with regard to the elements of causation and medical necessity and disputes the nature of the remedy, Def. Memo, D. 313 at 17-26, the Court will review in more detail <u>Donovan II</u>'s analysis of those two elements and of the group basis for the plaintiffs' proposed remedy.

a)      <u>Causation</u>

In <u>Donovan II</u>, the Court observed that the relevant question for this case is whether "the design defect [alleged by the plaintiffs]–Marlboro cigarettes' excessive carcinogenicity–caused their injury, meaning both proximate cause (legal cause) and the cause-in-fact (actual cause) of their subcellular harm."  <u>Donovan II</u>, 268 F.R.D. at 14 (citing <u>Wasylow v. Glock, Inc.</u>, 975 F. Supp. 370, 377 (D. Mass. 1996) and <u>Ulwick v. DeChristopher</u>, 411 Mass. 401, 408 (1991)).  The Court noted that proximate cause "is an objective requirement," <u>id.</u> (quoting <u>United States v Patriarca</u>, 912 F. Supp. 596, 608 (D. Mass. 1995)) that "focuses on what the defendant knew at the time of the alleged

wrongdoing," id. (citing Patriarca, 912 F. Supp. at 608) and "can therefore be proven on a class-wide

basis and is not at issue here."  Id.  Actual causation, on the other hand, turns on a substantial factor

test in cases that involve two or more causal events allegedly sufficient to bring about plaintiffs'

harm, id. at 14 n.8 (citing Matsuyama v. Birnbaum, 452 Mass. 1, 30-31 and 30 n.47 (2008)),[11] and

was vigorously disputed by Philip Morris in certification proceedings.  The Court considered a series

of arguments made by Philip Morris–first, that the plaintiffs must prove not only that Philip Morris

could have designed an alternative, safer cigarette, but also "that the alternative design would have

prevented their injury, which they cannot do," id. at 14 (emphasis in original); second, that "proof

of alternative design requires proof that the plaintiffs would have smoked the less carcinogenic

cigarettes, which necessarily involves individual inquiries," id. at 14 (emphasis in original); and

third, that "excessive carcinogenicity [in Marlboro cigarettes] cannot be the 'but for' cause of [the]

plaintiffs' injuries because their subcellular harm would have occurred even if they had smoked

cigarettes that were less carcinogenic," id.–and rejected each one.  Id. at 14-16.

    First, as to Philip Morris' contention that an alternative design would have prevented the

plaintiffs' injury, the Court stated that this position rests on a "mischaracteriz[ation of] the law."

Donovan II, 268 F.R.D. at 14.  The Court reviewed the relevant state law and concluded that "in

fact, Massachusetts law only requires the plaintiff to show that 'an available design modification

would . . . reduce the risk.'"  Id. (quoting Colter v. Barber-Greene Co., 403 Mass. 50, 57 (1988))

(emphasis added by Donovan II); see id. (collecting cases).  The Court thus held that in this case,

---

    [11] More precisely, the Court noted that "Massachusetts courts use a substantial factor test,
instead of a but-for cause test, in cases in which there were two or more causal events sufficient
to bring about the plaintiffs' harm.  But in cases in which one defendant's conduct is alleged to
have caused the harm, a but-for cause test is appropriate."  Donovan II, 268 F.R.D. at 30 n.8
(citing Matsuyama, 452 Mass. at 30-31 and 30 n.47).

"under Massachusetts law, [the] plaintiffs need only show that the less carcinogenic cigarette design would have <u>reduced</u> their risk of lung cancer, not that it would have prevented it entirely," <u>id.</u> (emphasis in original), noting that "[t]o hold otherwise would contradict the SJC's holding in <u>Haglund v. Philip Morris</u>, 446 Mass. 741[, 743] (2006), in which the SJC agreed that 'there is no such thing as a safe cigarette.'   The best plaintiffs can ask for is a <u>safer</u> cigarette.   To require Plaintiffs to prove that their proposed alternative design would completely prevent injury would preclude all liability in design defect cases for tobacco and, indeed, all other dangerous products - just what the SJC opinion in <u>Haglund</u> seeks to avoid. . . . Philip Morris' proposed requirement that an alternate cigarette design completely prevent injury is incompatible with both Massachusetts design defect case law and the SJC's holding in <u>Haglund</u>."   <u>Donovan II</u>, 268 F.R.D. at 14-15 (emphasis in original).[12]

Second, as to Philip Morris' argument "that cause-in-fact requires [the] plaintiffs to prove they would have smoked the less carcinogenic cigarettes," the Court held that "[a]gain, [D]efendant mischaracterizes Massachusetts law."   <u>Donovan II</u>, 268 F.R.D. at 15.   Read properly,

_____

[12] As the Court noted in <u>Donovan II</u>, <u>Haglund</u> "did leave open a small window" for an affirmative defense of unreasonable use if "'an individual consumer's behavior [is] so overwhelmingly unreasonable in light of the consumer's knowledge about, for example, a specific medical condition from which [s]he suffers,' . . . [and] 'the defendant [can] demonstrate that the plaintiff knew of her particular medical condition and the risks smoking posed to that specific condition at the time she began smoking.'" <u>Donovan II</u>, 268 F.R.D. at 20 (quoting <u>Haglund</u>, 446 Mass. at 743, 754).  The only example of such a medical condition offered by the Supreme Judicial Court was emphysema.  <u>Haglund</u>, 446 Mass. at 753.  This Court noted that the unreasonable use exception set forth in <u>Haglund</u> "could not be narrower," and noted that in this case, "[t]he class member who would fit into this exception is rare, if she exists at all . . . . Such a narrow exception surely cannot stand in the way of class certification.  The class can be certified so as to exclude those who had serious medical conditions such as emphysema when they began to smoke." <u>Donovan II</u>, 268 F.R.D. at 20.  Philip Morris has not argued that decertification is justified on the basis of any forthcoming affirmative defense of unreasonable use.  <u>See generally</u> Def. Memo, D. 313; Def. Reply, D. 329.

"Massachusetts design defect law does not require proof that [a] plaintiff would have used the alternative design had it been available.  Rather, the plaintiffs must prove only that Marlboro cigarettes' design enhanced their injury 'over and above that which would have been sustained' with a safer design."  Id. (quoting Lally v. Volkswagen Aktiengesellschaft, 698 N.E.2d 28, 38 (Mass. App. Ct. 1998)).  That is, "[r]ather than proving that [a] plaintiff would have used the alternative design, '[a] plaintiff need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it.'"  Id. (quoting Haglund, 446 Mass. at 746).  Thus, since a "plaintiff need not prove that a manufacturer even contemplated an alternative design, she obviously cannot be required to prove she would have used it."  Id.

Finally, Dononvan II held that this conclusion "also disposes of Philip Morris' argument that whether the less carcinogenic cigarette would reduce a class member's risk of cancer will vary because individuals smoke cigarettes differently–for example, they take different sized puffs, take a different number of puffs per cigarette, etc."–or that "some smokers may compensate if they switch cigarette styles by smoking more cigarettes or holding smoke in their lungs longer," Donovan II, 268 F.R.D. at 15, because:

> whether an alternative design will decrease risk is a theoretical and probabilistic inquiry.  Since plaintiffs did not use the alternative design (indeed the design need not have ever been manufactured), it is impossible to know the exact effect on the particular smoker.  If Philip Morris' argument were correct, no plaintiff could prove causation, as a defendant could always argue that the plaintiff would have used the alternative design in such a way as to reintroduce the risk.

Id. at 15 n.9.  The Court also examined the plaintiffs' allegation that, as a matter of fact, while the extent of "expos[ure] to subcellular harm and increased risk of cancer . . . may vary among class members, . . . twenty pack-years of smoking necessarily causes subcellular harm."  Id. at 16 (emphasis in original).  The Court noted that the "[p]laintiffs, of course, must prove this at trial" in

order to ultimately prevail in this case, but found that "their expert affidavits and depositions" submitted prior to the certification proceedings were "sufficient on this point for class certification purposes." Id. (citations to the record omitted).

          b)          <u>Medical Necessity</u>

After discussing causation at considerable length, the Court in <u>Donovan II</u> dealt more swiftly with the issue of medical necessity. The Court acknowledged the plaintiffs' expert Dr. Albert Miller's statement that "before prescribing a LDCT scan to a class member, he would also consider that person's other illnesses and overall state of health," <u>Donovan II</u>, 268 F.R.D. at 16 (citing Miller Deposition (unexcerpted), D. 114-8 at 75-76 (deposition taken January 12, 2010)), and conceded that this was "an individual inquiry," <u>id.</u>, but nonetheless held that "this threshold question need not foreclose class certification" because "[t]he remedy [the] plaintiffs seek is a program that invites medical personnel to manage it and its participants" and these personnel "would surely ask preliminary medical questions before performing the scan to ensure its safety for the patient" because here, "[a]s in any medical monitoring program, some variation among patients is built into the program." Id. at 16-17.

          c)          <u>Group Injury and Remedy</u>

<u>Donovan II</u> considered but dismissed Philip Morris' argument that the relief sought by the plaintiffs was individual rather than "respecting the class as a whole." <u>Donovan II</u>, 268 F.R.D. at 27 (quoting Fed. R. Civ. P. 23(b)(2)). The Court found that "the medical monitoring remedy the plaintiffs seek here will be uniform for all members and does not require individual tailoring." <u>Id.</u> The Court conceded that "[c]ertainly, some minor variation among members is to be expected," but noted that "this is built into and part of the remedy" because "[t]he monitoring program would include medical personnel to manage the participants . . . [,] is a single consistent program and does

not 'depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members.'" Id. (quoting Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO, 216 F.2d 577, 580 (7th Cir. 2000)).  The Court then found that as a general matter, "'[t]o administer medical monitoring piecemeal is unworkable,'" id. (quoting Day v. NLO, 851 F. Supp. 869, 886-87 (S.D. Ohio 1994)), since "[t]he groupwide provision of relief follows from the common nature of th[e] uncertain harm [inherent in medical monitoring claims]," id. (quoting Pankaj Venugopal, Note, The Class Certification of Medical Monitoring Claims, 102 Colum. L. Rev. 1659, 1684 (2002)), and found further that in this case the specific LDCT screening program proposed by the plaintiffs "is by its nature group." Id.[13]  Additionally, the Court noted that the plaintiffs' "proposed relief, the LDCT program, will be common to and uniform for all class members.  If successful, [the] plaintiffs will receive from Philip Morris a medical monitoring fund which they may only use to implement their proposed program.  Thus damages will not present individualized determinations since class members will not receive individual awards." Id. at 29. Accordingly, the Court found that the plaintiffs had met the Rule 23(b)(2) criteria and were eligible for certification under that rule. Id. at 28.

iii.    Rule 23(b)(3)

In regard to Rule 23(b)(3)'s predominance requirement, the Court in Donovan II noted that, "[w]hile 'the predominance criterion is far more demanding' than the commonality requirement" in Rule 23(a)(2), Donovan II, 268 F.R.D. at 28 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997)), the predominance requirement nonetheless "presumes that individual issues will exist," id. (citing Payne, 216 F.R.D. at 26-27), and "the heart of the predominance inquiry is whether

---

[13] The Court also noted that "this case, like many class actions, would be of little value if brought individually."  Donovan II, 268 F.R.D. at 27.

the 'uncommon issues' outweigh the commonalities." Id. (quoting Amchem, 521 U.S. at 624). See also id. ("Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class") (quoting Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003)). The Court held that "[h]ere, [the] plaintiffs' common issues predominate." Id. Referring to Donovan II's earlier analysis in the Rule 23(b)(2) context of the seven elements of the medical monitoring cause of action set forth by the Supreme Judicial Court in Donovan I, the Court reiterated that "all seven elements . . . may be proven on a class-wide basis," and noted specifically that the "plaintiffs share common questions of (1) Philip Morris' alleged breach of warranty; (2) causation; (3) exposure, subcellular harm, and increased risk of cancer; (4) the efficacy of LDCT testing; (5) the standard of care; and (6) the cost of the proposed monitoring program" as well as "proposed relief [that] will be common to and uniform for all class members [and] . . . . will not present individualized determinations." Id. at 28-29. Accordingly, the Court found that "common issues predominate" sufficient to render the plaintiffs' class eligible for certification pursuant to Rule 23(b)(3). Id. at 29.

The Court's analysis of Philip Morris' motion for decertification with regard to commonality, group injury and remedy, and predominance will turn on the impact, if any, of post-certification discovery or changes in controlling law.

b.    Change in Law: *Dukes* and Post-*Dukes* Caselaw

Philip Morris argues, correctly, that Dukes "clarified" Rule 23(a)(2)'s commonality requirement. Def. Memo, D. 313 at 17. Dukes noted that Rule 23(a)(2)'s "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.' . . . What matters to class certification . . . is not the raising of common 'questions'–even in droves–but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the

resolution of the litigation.'" Dukes, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in an Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131-32 (2009)). Applying this rule to the case brought by the plaintiffs in Dukes, who "wish[ed] to sue about literally millions of employment decisions at once," id. at 2552, in a legal context where "the crux of the inquiry is 'the reason for a particular employment decision,'" id. (quoting Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984)), the Court concluded that "without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the critical question why was I disfavored." Id. at 2552 (emphasis in original).

Dukes' clarification of the commonality requirement set forth in Fed. R. Civ. P. 23(a)(2), however, does not undercut this Court's earlier finding that the action brought by the plaintiffs in this case present common issues sufficient to satisfy Rule 23(a)(2). Specifically, questions that go to the heart of the elements of the cause of action in this case–questions such as "Did Philip Morris design Marlboro cigarettes defectively and negligently?," "Does a 20-pack-year history of smoking Marlboro cigarettes necessarily lead to subcellular change that increases the risk of lung cancer?," "Are LDCT scans an effective medical test for reliable early detection of lung cancer?," and "Does early detection of lung cancer, combined with prompt and effective treatment, significantly decrease the risk of death?," which track the first, third, fourth and fifth elements for a medical monitoring action set forth in Donovan I, 455 Mass. at 226–will each be answered either "yes" or "no" for the entire class; the answers will not vary by individual class member. Similarly, Philip Morris does not dispute that the question "How much will the plaintiffs' proposed LDCT screening program cost?," which tracks the seventh element set forth in Donovan I, id., will have one answer that

applies to the entire class.[14]  As the Court held in its June 24, 2010 certification order, these common issues are more than enough to satisfy the commonality requirement set by Rule 23(a)(2).  Donovan II, 268 F.R.D. at 10.  Dukes does not change that analysis.  Dukes, 131 S.Ct. at 2556 ("for purposes of Rule 23(a)(2), even a single common question will do") (internal citations and quotations omitted).

The various cases offered by Philip Morris involving courts that have relied on Dukes' discussion of Fed. R. Civ. P. 23(a)(2)'s commonality requirement, each of which lacks common issues of the sort abundantly present in this case, are not to the contrary.  See, e.g., In re Countrywide Financial Corp. Mortg. Mktg. and Sales Practices Litig., 2011 WL 4809846, at *7-*20 (S.D. Cal. October 11, 2011) (no commonality where each element of each claim required individual evidentiary inquiry above and beyond the body of evidence shared in common by the plaintiffs); In re Bisphenol-A (BPA) Polycarbonate Plastics Prods. Liab. Litig., 276 F.R.D. 336, 340-46 (W.D. Mo. 2011) (no commonality where multi-state nature of litigation precludes any accurate grouping of claims to establish common questions of law); Haynes v. Planet Automall, Inc., 276 F.R.D. 65, 79-80 (E.D.N.Y. 2011) (no commonality where plaintiff has not shown that "the only genuinely disputed questions of law or fact . . . can be answered uniformly on a classwide basis"); Groussman v. Motorola, Inc., 2011 WL 5554030, at *3 (N.D. Ill. November 15, 2011) (no commonality where "[p]laintiffs have not shown that class members in the proposed class have suffered the same injury"); Jamie S., 2012 WL 336170 at *14 (no commonality where the class "lack[s] any common

---

[14] The Court in Donovan II also held, over Philip Morris' objection, that the second and sixth elements set forth in Donovan I–causation and reasonable medical necessity–are susceptible to common proof.  Donovan II, 268 F.R.D. at 14-17.  As discussed in more detail below, there has been no change in relevant law or fact sufficient to compel decertification on these issues.

questions"). The only possible exception is Corwin v. Lawyers Title Ins. Co., 276 F.R.D. 484 (E.D.

Mich. 2011), where a court opining in the wake of Dukes appeared to hold that the Rule 23(a)(2)

commonality requirement could not be satisfied unless every (rather than any) key legal question

could be answered on the basis of common proof. See Corwin, 276 F.R.D. at 490 (concluding that

"the plaintiff cannot satisfy the requirement of Rule 23(a)(2) because, although there are questions

common to the absent class members and the plaintiff that must be decided before liability is

established, the critical inquiry without which liability cannot attach requires individualized

determination"). Even if this can be fairly construed as the holding of Corwin, such an out-of-circuit

holding is not binding on this Court, United States v. Lang, 2012 WL 502698, at *6 n.15, nor does

it appear to be consistent with the persuasive manner in which courts in this district have interpreted

Rule 23(a)(2) in the wake of Dukes.  See, e.g., Connor B., 2011 WL 5513233 at *4 (noting that

commonality turns on whether "there is no common question that could generate a common answer

to resolve an issue central to the litigation") (emphasis added).[15]  In any event, because the Court's

June 24, 2010 order did hold that each key legal question in this case is susceptible to common

proof, and because (as discussed below) there is no reason to revisit that conclusion, Philip Morris'

---

[15] Philip Morris also cites to Corwin in support of the proposition that "'generalized or abstract commonality' [is] insufficient for certification of a (b)(2) class after Dukes." Def. Memo, D. 313 at 18 (quoting Corwin, 276 F.R.D. at 489). This appears to be a misreading of Corwin, which discussed commonality only in relation to Rules 23(a)(2) and (b)(3), id. at 489-90, and precluded Rule 23(b)(2) certification only on the ground the plaintiffs in Corwin sought individualized damages rather than purely declaratory or injunctive relief. Id. at 490 ("[e]ven if the class could be certified under Rule 23(b)(2) on the declaratory judgment count, before the main form of relief sought–damages–could be awarded, individualized decisions on liability would have to be made on the unjust enrichment count"). To the extent Philip Morris seeks to offer Corwin as relevant authority on Rule 23(b)(2), Corwin falls into the same category as Huber and Ellis, each of which is inapposite because, as discussed supra, the plaintiffs in those cases sought individual monetary damages as opposed to the wholly injunctive relief sought by the plaintiffs here.

reliance on <u>Corwin</u> does not undermine this Court's earlier conclusion that the plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

In its decertification motion, Philip Morris argues that the two of the elements of the plaintiffs' medical monitoring claim–causation (i.e., whether the plaintiffs would have avoided the need for medical monitoring by use of an alternatively designed cigarette, Def. Memo, D. 313 at 23-26) and medical necessity (i.e., whether each class member has twenty pack-years of smoking and whether each class member's age, smoking history, and health history permits them to benefit from LDCT scanning, Def. Memo, D. 313 at 20-23)–can be proved only on an individual basis, not a group-wide basis, and asserts that the plaintiffs are thus unable to satisfy either Rule 23(b)(2)'s requirement that the defendant has acted "on grounds that apply generally to the class" or Rule 23(b)(3)'s requirement that common issues "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(2)-(3). As discussed above, the Court, in its June 24, 2010 certification order, already evaluated these arguments at length and rejected them, <u>Donovan II</u>, 268 F.R.D. at 14-17, 27-29, so whether decertification is warranted turns on any subsequent change in law or fact. Philip Morris has offered a handful of cases that it asserts establish a change in the law; the Court will address each case in turn.

First and foremost, <u>Dukes</u>–which involved allegations of employment discrimination rather than defective product design and claims of back pay rather than a medical monitoring claim–does not speak directly to issues of medical necessity or causation in either the general applicability context of Rule 23(b)(2) or the predominance context of Rule 23(b)(3), or, for that matter, the commonality context of Rule 23(a)(2). <u>See Dukes</u>, 131 S. Ct. at 2556-61. Accordingly, <u>Dukes</u> does not on its face compel the Court to change the analysis included in <u>Donovan II</u> regarding causation or medical necessity in the Rule 23(b) context. Philip Morris concedes as much, arguing not that

_Dukes_ establishes new controlling law with regard to Rule 23(b) but only that "[r]ecent decisions have . . . recognized that the _Dukes_ commonality holding has implications for the application of Rules 23(b)(2) and (b)(3)." Def. Memo, D. 313 at 18.

Philip Morris first reinvokes _Gates_, already discussed _supra_ in the injunctive relief context, this time for the proposition that, "because [causation and medical necessity] are almost always individualized, medical monitoring cases generally 'founder' at class certification." Def. Memo, D. 313 at 19-20 (citing _Gates_, 655 F.3d at 264).  _Cf._ _Gates_, 655 F.3d at 264 ("[b]ecause causation and medical necessity often require individual proof, medical monitoring classes may founder"). _Gates_ is clearly distinguishable from the case at hand.  In _Gates_, the proposed medical monitoring class would have included "[a]ll individuals who lived for one year or more in total" in a certain community "from January 1, 1968 to December 31, 2002," _id._ at 259, and liability turned in part on whether the plaintiffs had endured "exposure greater than normal background levels" to vinyl chloride, whether "as a proximate result of the exposure, [each] plaintiff has a significantly increased risk of contracting a serious latent disease" and whether "the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles," as interpreted under Pennsylvania law.  _Id._ at 265.

As to causation, the _Gates_ court noted that "Plaintiffs have failed to propose a method of proving the proper point where exposure to vinyl chloride presents a significant risk of developing a serious latent disease for each class member.  [Instead,] Plaintiffs propose a single concentration without accounting for the age of the class member being exposed, the length of exposure, other individual factors such as medical history, or showing the exposure was so toxic that such individual factors are irrelevant" under Pennsylvania law.  655 F.3d at 268.  Here, in contrast, the plaintiffs have proposed and the Court has already accepted for class certification purposes that, "[w]hile the

extent of the damage and risk may vary among class members, . . . twenty pack-years of smoking <u>necessarily causes</u> subcellular harm" sufficient to establish harm under Massachusetts law. <u>Donovan II</u>, 268 F.R.D. at 16 (emphasis in original).

As to medical necessity, the <u>Gates</u> court first noted that as a general matter, the Third Circuit has "been skeptical that the necessity for individuals' medical monitoring regimes can be proven on a class basis" since long before <u>Dukes</u> was issued, <u>Gates</u>, 655 F.3d at 268 (citing <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 146 (3d Cir. 1998)), and held that in light of the deeply divided expert testimony as to whether "the negative health effects of [plaintiffs' proposed] screening [regimen][16] may outweigh any potential benefits" and the "defense experts' detailed discussions of why the medical monitoring regime would present individual rather than common issues," the district court was entitled to deny certification. <u>Id.</u> at 269. Here, in contrast, the Court held the fact that "before prescribing a LDCT scan to a class member, [a doctor] would also consider that person's other illnesses and overall state of health" as part of an individual inquiry was merely a "preliminary medical question" that is "built into the program" of administering any medical monitoring program, and did not preclude a determination as to whether "LDCT screening is 'reasonably necessary' [under Massachusetts law] on a class basis." <u>Donovan II</u>, 268 F.R.D. at 16-17. There is far less factual dispute in this case than there was in <u>Gates</u> as to whether the monitoring regime proposed by the plaintiffs would pose medical risks that could outweigh the benefits of monitoring. While it may still be possible that, in light of the Third Circuit's skepticism about the nature of the medical

---

[16] The medical monitoring in <u>Gates</u> was for incipient brain cancer, and there was evidence in <u>Gates</u> that serial MRI scans sought by the plaintiffs in that case caused toxicological negative health effect not implicated by the LDCT scans recommended here. <u>Gates</u>, 655 F.3d at 269. Additionally, there was evidence in <u>Gates</u> that the contrast agent used for MRIs would have "pose[d] dangers to those with kidney diseases," <u>id.</u>; there is no analogous risk identified here.

necessity for medical monitoring and in light of any relevant differences between Massachusetts and Pennsylvania law regarding medical necessity, the <u>Gates</u> court would have refrained from certifying the class in this case, any difference between the <u>Gates</u> court and this Court would have existed at the time this Court issued its June 24, 2010 certification order.  <u>Gates</u> in no way suggests that <u>Dukes</u> constitutes a change in controlling law that would merit revisiting this Court's earlier rejection of Philip Morris' arguments with regard to either medical necessity or causation.

Philip Morris next points to <u>Witt v. Chesapeake Exploration, LLC</u>, 276 F.R.D. 458 (E.D. Tex. 2011), which it asserts stands for the proposition that "[a]llowing [the] plaintiffs to prevail on their medical monitoring claims without proving medical necessity . . . merely because that element of their claims cannot be determined on a classwide basis" would impermissibly "alter the plaintiffs' burden of proof at trial in order to facilitate class certification."  Def. Memo, D. 313 at 22.  Before turning to <u>Witt</u> itself, the Court notes that Philip Morris' assertion misconstrues the Court's June 24, 2010 certification order with regard to medical necessity.  Under Massachusetts state law, the key question is whether there has been "a physiological change resulting in a substantial increase in the risk of cancer, and . . . that increase, under the standard of care, triggers <u>the need</u> for available diagnostic testing [via] an efficacious method of lung cancer screening or surveillance."  <u>Donovan I</u>, 455 Mass. at 229 (emphasis added); <u>see also</u> <u>id.</u> at 226 (elements of medical monitoring claim include proof that "diagnostic medical examinations are reasonably (and periodically) <u>necessary</u>, conformably with the standard of care") (emphasis added).  Philip Morris is correct to point out that certain individuals may be unfit to receive the LDCT scans sought by the plaintiffs, either because they are too obese to fit in the LDCT scanner or because they have co-morbidities that would preclude them from receiving the surgical care indicated by a positive LDCT scan, and the Court acknowledged as much.  <u>Donovan II</u>, 268 F.R.D. at 16-17.  But an individual plaintiff's medical

inability to satisfy his or her _need_ for diagnostic examination does not alter the fact that he or she has undergone physiological change that increases a risk of cancer and triggers the need for diagnostic surveillance in the first place.  As the Court has already noted, the June 24, 2010 certification order made clear that the Court accepted for certification purposes the assertion that "everyone with a twenty pack-year smoking history has suffered subcellular harm, and subcellular changes necessarily mean increased risk of lung cancer," which is sufficient to trigger a _need_ for monitoring that is common to the class, whether or not that need can actually be satisfied in any individual case.  Donovan II, 268 F.R.D. at 16 (emphasis in original) (internal citations omitted).

Witt does not compel a different conclusion since it is clearly distinguishable.  Witt involved a group of mineral lessors who sued an oil and gas company for alleged breach of over 500 oil and gas leases in Texas.  276 F.R.D. at 460.  The Witt court held that whether any individual lease was breached turned on "the circumstances surrounding the negotiation, execution, and delivery of each individual lease as well as the reasons that payment [under the lease] was reduced, delayed or refused," and that the defendant had the right, under both the statutory law of Texas and that state's common law, to examine those circumstances, especially with regard to the issue of waiver.  Id. at 469, 469 n.51.  Witt cited Dukes for the proposition that "'a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims.'"  Id. at 469 (quoting Dukes, 131 S. Ct. at 2561).  Here, however, Philip Morris is not invoking any statutory defense; it is contesting the fundamental issue of whether the class actually needs monitoring and it is fully entitled to litigate at trial its position on that question.  Its right to do so is in no way abridged by this Court's earlier ruling that the question is susceptible to common rather than individual proof.

Finally, Philip Morris points to recent decisions in two tobacco-related medical monitoring class action cases, Caronia v. Philip Morris USA, Inc., 2011 WL 338425 (E.D.N.Y. January 13, 2011) and Gargano v. Philip Morris USA, Inc., 2011 WL 2445869 (S.D. Fla. June 20, 2011), where district courts have dismissed medical monitoring claims very similar to the one brought by the plaintiffs in this case. Significantly, neither case was governed by the Supreme Judicial Court's opinions in Donovan I, Haglund and Matsuyama, as are the plaintiffs' claims here. Caronia and Gargano turned on the but-for causation tests applicable under New York law and Florida law, respectively, and both opinions explicitly rejected the less onerous substantial factor test urged by the plaintiffs in the respective cases. Caronia, 2011 WL 338425 at *11-*12; Gargano, 2011 WL 2445869 at *2. More specifically, in both Caronia and Gargano, the plaintiffs alleged that excessive carcinogens in Marlboro cigarettes increased their risk of cancer above and beyond the increased risk they would have suffered had Philip Morris developed a safer cigarette, and each court held that the relevant test was not whether a safer cigarette would have merely reduced the degree of the plaintiffs' increased cancer risk but rather whether it would have removed the increase entirely even in light of the plaintiffs' smoking history. Caronia, 2011 WL 338425 at *11-*12; Gargano, 2011 WL 2445869 at *2. Massachusetts law is notably different. Massachusetts law requires a plaintiff to show only that an available design modification would reduce risk compared to an allegedly negligent design rather than prevent the injury entirely. Donovan II, 268 F.R.D. at 14 (citing Colter, 403 Mass. at 57). Additionally, as the Court has previously noted, Donovan I and Haglund taken together "sharply curtailed the applicability of the unreasonable use defense" under Massachusetts law and thus "limited the relevance of individual circumstances of use" in Massachusetts compared with the law in other states. Donovan II, 268 F.R.D. at 30. Neither Caronia nor Gargano provides a reason for revisiting this Court's previous holdings with regard to Massachusetts law.

47

Accordingly, there has been no change in law–at least as to whether the plaintiffs' claims exhibit sufficient commonality, group-based injury, group-based remedy, and predominance of common issues–that would support decertifying the class here.

          c.        <u>Post-Certification Discovery: Limits on Who Receives LDCT Scans</u>

Philip Morris points briefly to three examples of post-certification deposition testimony in support of its assertion that "even for those individuals who have smoked the requisite number of cigarettes, determining medical necessity would involve other individualized inquiries regarding their age, smoking history, health history and ability to benefit from the scan."  Def. Memo, D. 313 at 21 (citing Oliver Deposition (excerpts provided by Philip Morris), D. 313-3 at 3 ("if people have significant co-morbidities that would preclude their having surgeries . . . those individuals perhaps should be advised not to participate unless their medical condition changed") (deposition taken June 9, 2011); Markowitz Deposition (excerpts provided by Philip Morris), D. 313-9 at 5 (individual class member should "participate in the decision making about [whether to receive a] CT scan" based on "individual risk factors for lung cancer, and the problems if they have a CT scan or not [and] what the limitations might be of having a CT [scan]") (deposition taken June 7, 2011); Pass Deposition (excerpts provided by Philip Morris), D. 313-10 at 4 (whether to perform a LDCT scan on an individual class member "depends upon the function of the patient, whether the patient is going to be able to tolerate treatment if treatment is going to be recommended, or biopsy, if a biopsy is going to be recommended . . . there may be patients who are functionally not able to participate") (deposition taken June 8, 2011)).  This evidence is wholly consistent with the Court's statement on June 24, 2010 that "[t]he remedy [the] plaintiffs seek is a program that invites medical personnel to manage it and . . . . [who] would surely ask preliminary medical questions before performing [an LDCT] scan to ensure its safety for the patient."  <u>Donovan II</u>, 268 F.R.D. at 16.  As the Court held

on June 24, 2010, this fact is unremarkable in a medical monitoring class action and does not preclude the Court reaching a class-wide determination as to whether the plaintiffs have a need for available diagnostic testing, whether or not they are individually medically able to satisfy that need. Id.

Accordingly, the post-certification deposition testimony relied upon by Philip Morris does not justify decertifying the class as to the issue of whether the medical necessity element of the plaintiffs' claim can be addressed on a class-wide as opposed to individual basis.

        3.      Ascertainability

Although not explicitly mentioned in Rule 23,[17] an implicit prerequisite to class certification is that a "class" exists–that is, it must be "administratively feasible to determine whether a particular individual is a member." Kent v. SunAmerica Life Ins. Co., 190 F.R.D. 271, 278 (D. Mass. 2000) (citing 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1760 (2d ed. 1972)). A class need only be determinable by "stable and objective factors" at the outset of a case, id.; not every class member must be identified, but the class must be sufficiently ascertainable to permit a court to "decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment." Id. (citing Crosby v. Soc. Sec. Admin. of the U.S., 796 F.2d 576, 580 (1st Cir. 1986)). Philip Morris argues that the class here is unascertainable both in that "each purported class member's smoking history would not be verifiable by objective evidence because it would depend significantly on each individual's own promise that he or she meets the criteria" and in that "determining whether each individual was under medical investigation or a

_____

[17] As the Court has previously noted, "the four traditional 23(a) factors embrace [an] appraisal [of ascertainability,] and most courts do not independently address 'administrative feasibility' or 'ascertainability.'" Donovan II, 268 F.R.D. at 9 (collecting cases). The Court nonetheless addressed ascertainability "for the sake of thoroughness." Id.

physician's care for lung cancer . . . would entwine the Court in fact-intensive inquiries."  Def. Memo, D. 313 at 27.

a.  Analysis in *Donovan II*

These contentions were raised during the certification proceedings and were explicitly rejected by the Court in <u>Donovan II</u>.  First, the Court rejected as inapposite cases that "involve much more complex medical determinations than those at issue here," <u>Donovan II</u>, 268 F.R.D. at 9, noting that "there are only two factors to examine–smoking history and a diagnosis of lung cancer," both of which are clearly objective:  "Either someone has smoked for at least twenty pack-years or he has not; either someone is under a physician's care for suspected cancer or he is not."  <u>Id.</u>  Indeed, the Court pointed out that "Philip Morris itself possesses an objective way to determine the smoking history of many purported class members, namely, its internal database of long-term customer information, the Marlboro Miles program, which contained about 25 million names as of 1999." <u>Id.</u>  The Court thus held that Philip Morris' concern "is 'primarily one of manageability, and not ascertainability.'"  <u>Id.</u> (quoting <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, 209 F.R.D. 323, 337 n.20 (S.D.N.Y. 2002)).  The Court also noted both that "potential class members who are already suspected of having lung cancer would have little incentive to lie about their situation" since "medical monitoring would not benefit them," <u>id.</u> at 9, and that "[a]n illiquid remedy" such as the one sought here by the plaintiffs "reduces the incentives for plaintiffs to falsely claim relief not owed to them" because class members cannot "cash out their share of the medical monitoring relief."  <u>Id.</u> at 10 (quoting Venugopal, <u>supra</u>, at 1693).  In light of these findings, the Court found the class to be ascertainable.  <u>Id.</u> at 10.

b.      Change in Law: *Xavier*, *Dukes* and *Jamie S.*

Philip Morris concedes that the arguments it marshals in support of decertification as to ascertainability were explicitly rejected by the Court's June 24, 2010 order.  Def. Memo, D. 313 at 27 (citing Donovan II, 268 F.R.D. at 9).  It argues that three post-certification cases, Xavier v. Philip Morris USA Inc., 787 F. Supp. 2d 1075 (N.D. Cal. 2011), Dukes and Jamie S., have changed the legal landscape enough to justify decertification.  The Court disagrees.

To be sure, Xavier is a case that flatly disagrees with the analysis in this Court's June 24, 2010 order.  The plaintiffs in Xavier, like the plaintiffs here, sought to certify a class of individuals who had a twenty-pack year history of smoking Marlboro cigarettes and had not yet contracted lung cancer, Xavier, 787 F. Supp. 2d at 1088, urged the court to look at the Marlboro Miles program as proof that ascertainability would not be problematic, id. at 1090, urged further that the court should allow plaintiffs to submit affidavits attesting to their smoking history and emphasized that there was little or no incentive for non-class-members to lie in order to obtain class relief, id., and concluded that the real issue was not ascertainability but administration, which could be easily addressed by referring physicians as part of the relief sought by the plaintiffs.  Id.  The plaintiffs here raised each of those points and on each point the Court agreed; in Xavier the court rejected each point in turn, id. at 1088-91, and concluded that "individuals with a twenty-pack-year history as Marlboro smokers could not be identified through any reliable, manageable means" and that "[a]ccordingly, the proposed class lacks ascertainability."  Id. at 1091.  Of course, Xavier is not controlling on this Court.  To the extent that Xavier rejects grounds adopted by this Court in Donovan II, the Court finds Donovan II more persuasive and Xavier insufficient to justify decertification here.

Dukes, on the other hand, does control this Court.  Dukes was handed down by the Supreme Court two months after Xavier was decided, and Philip Morris argues that Dukes "confimed [the]

51

underlying reasoning" of <u>Xavier</u>. Def. Memo, D. 313 at 28. Specifically, it points to <u>Dukes'</u> statement that "Wal-Mart is entitled to individualized determinations of each employee's eligibility for back pay," <u>Dukes</u>, 131 S. Ct. at 2560, and interprets the statement as an endorsement of <u>Xavier</u>'s position that there is no reliable way to determine an individual's smoking history without individual adversarial proceedings and as a rejection of this Court's contrary conclusion that smoking history can be administratively determined as part of the plaintiffs' proposed programmatic remedy. Def. Memo, D. 313 at 28-29. The Court cannot subscribe to this interpretation of <u>Dukes</u>, which rooted its holding regarding back pay in the specific statutory scheme at issue; the statement in <u>Dukes</u> so heavily relied on by Philip Morris is immediately followed by the following statement: "Title VII includes a detailed remedial scheme." <u>Dukes</u>, 131 S. Ct. at 2560. <u>Dukes</u> then traced both the authority of courts to fashion a remedy for Title VII violations and the defenses available to a Title VII defendant employer to the specific text of Title VII. <u>Id.</u> at 2560-61 (quoting at length from Title VII, 42 U.S.C. § 2000e-5(g)(1) and § 2000e-5(g)(2)(a)). The opinion proceeded to discuss the caselaw surrounding special individual proceedings available to defendants who face allegations of Title VII "pattern or practice" violations (as Wal-Mart did in <u>Dukes</u>). <u>Id.</u> at 2561 (quoting at length from <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 361-62 (1977)). <u>Dukes</u> concluded by citing the Rules Enabling Act, 28 U.S.C. § 2072(b), frequently invoked here by Philip Morris, for the principle that "a class cannot be certified on the premise that Wal–Mart will not be entitled to litigate its <u>statutory defenses</u> to individual claims." <u>Id.</u> (emphasis added).

Of course, here (and in <u>Xavier</u> as well), the issue is a common law tort rather than a statutory violation, Philip Morris has no statutory defenses to invoke, and the issue of whether an individual purported class member does in fact belong to the discrete category of smokers with a twenty-pack-year history of smoking Marlboro cigarettes is not a specific defense to be asserted by Philip Morris

52

but instead either 1) a determination to be made after the merits questions of whether Philip Morris is liable to anyone so situated has been litigated, <u>Donovan II</u>, 268 F.R.D. at 9, or 2) an element of the plaintiffs' burden on the merits of liability. <u>Xavier</u>, 787 F. Supp. 2d at 1089. <u>Dukes</u> is thus of little use in resolving any disparity between the analyses presented in this Court's June 24, 2010 order and the analysis presented in <u>Xavier</u>, and therefore does not compel this Court to decertify the plaintiffs' class on the basis of ascertainability.

The final case offered by Philip Morris is <u>Jamie S.</u>  In a notice filed with the Court after the January 27, 2012 decertification hearing, Philip Morris points out that <u>Jamie S.</u> stands for the proposition that a class is unascertainable where "the relevant criteria for class membership is unknown." Def. Notice of Supplemental Authority, D. 344 at 4 (quoting <u>Jamie S.</u>, 668 F.3d at 495). Indeed, <u>Jamie S.</u> went further, explicitly suggesting that where identifying whether an individual falls within the class definition "is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria," it may not be possible to ascertain a class. <u>Jamie S.</u>, 668 F.3d at 496. It is clear that the standard articulated in <u>Jamie S.</u> would not preclude class certification in this case. In <u>Jamie S.</u>, the mechanism by which class membership was to be determined was for a court sitting in 2012 "to decide whether there was reason to believe <u>in 2000–2005</u> that a presently unidentified child was <u>potentially eligible</u> for special-education services," <u>Jamie S.</u>, <u>id.</u> at 495 (emphasis in original), a determination that even if done contemporaneously (rather than at a remove of seven to twelve years) would be "highly individualized because every child is unique." <u>Id.</u> at 485. Here, on the other hand, the Court has already ruled that an individual's smoking history is a known, simple, objective criterion, <u>Donovan II</u>, 268 F.R.D. at 9, which coupled with the other criteria for class membership does not approach the indeterminate criteria that the Seventh Circuit disapproved in <u>Jamie S</u>. Accordingly, none of the

post-certification cases cited by Philip Morris for its argument regarding ascertainability warrants decertifying the class certified by this Court's June 24, 2010 and May 25, 2011 orders.

            c.      Post-Certification Discovery:  Marlboro Miles Program

Philip Morris has offered no recently discovered evidence in support of its arguments relating to ascertainability.  The plaintiffs, however, point to one category of post-certification developments that reinforces the Court's conclusion that the class here is ascertainable:  the production of Marlboro Miles program data by Philip Morris to the plaintiffs.  Pls. Memo, D. 315 at 33-35.  The plaintiffs argue that this program confirms that "Philip Morris maintains an extraordinarily robust up-to-the-moment customer database, tracking the names, ages, and various forms of contact information of Marlboro smokers," includes "[t]he names and contact information" of individuals "who apparently satisfy the class definition," and is "sufficient to corroborate class membership." Id.  Because the Court can (and has) rejected Philip Morris' arguments with regard to ascertainability without reliance upon the program, the Court need not address it in the context of Philip Morris's decertification motion.

            4.      Mass. Gen. L. ch. 93A

The plaintiffs assert that even if their class were to be decertified as to the medical monitoring claim defined in Donovan I, the class should survive with regard to the plaintiffs' claim under Mass. Gen. L. ch. 93A, because chapter 93A "provides a basis for class certification which is independent of, and far less demanding than, that contained in Fed. R. Civ. P. 23." Pls. Memo, D. 315 at 36.  Philip Morris did not address decertification of the class with regard to the plaintiffs' chapter 93A claim in its principal motion papers, see Def. Memo, D. 313, but only in its reply to the plaintiffs' claim that the class should survive even if the medical monitoring class was decertified. Philip Morris disagrees with the plaintiffs' suggestion that a less rigorous standard exists for the

54

certification of chapter 93A claims, and relies on <u>Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.</u>, 130 S.Ct. 1431 (2010), for the proposition that state laws of procedure regarding the certification of class actions "cannot apply in diversity suits" in federal court.  Def. Reply, D. 329 at 25 (quoting <u>Shady Grove</u>, 130 S.Ct. at 1437).  Similarly, the parties dispute whether the presence of an adequate remedy at law precludes class action proceedings pursuant to chapter 93A.  Pls. Memo, D. 315 at 37; Def. Reply, D. 329 at 25-26.  In light of the Court's conclusion that the plaintiffs' class continues to merit certification under Fed. R. Civ. P. 23 and the Court's continued rejection of Philip Morris' argument that a remedy at law would be adequate in this case, the Court need not reach the parties' arguments regarding how to proceed under Mass. Gen. L. ch. 93A in the event that the plaintiffs' class is decertified with regard to the medical monitoring claim since the Court has declined to do the latter.

## IV.    Conclusion

As discussed above, there is no change in law or relevant facts to warrant decertification of the class.  Accordingly, the Court's prior certification decision, which was the result of a half-decade's worth of diligent advocacy by the parties and thorough review by the Court before the instant case was transferred to this session, will stand.  Philip Morris' motion for decertification is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge
